FILED
JUL 1 9 2005
U.S. DISTRICT COURT
DISTRICT OF RHODE ISLAND

UNITED STATE DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

Stephen F. Chrabaszcz, Jr., et al

v. C.A. No. 03-133 S

Johnston School Committee, both
Individually and as Committee Members,
Et al.

DEFENDANTS' EXHIBITS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Marc DeSisto, Esq. #2757
DeSisto Law Offices
211 Angell Street
Providence, RI 02906
(401) 272-4442
Fax: (401) 272-9937

**CONTENTS**

**Exhibit A** - May 1, 2000, letter from Michael Jolin to Stephen Chrabaszcz

**Exhibit B** - Minutes, School Committee Meeting, June 20, 2000

**Exhibit C** - June 26, 2000, letter from Francis X. Flaherty to Michael Jolin

**Exhibit D** – June 6, 2000, letter from Michael Jolin to Stephen Chrabaszcz

**Exhibit E** – Employment Agreement

# EXHIBIT A

nnston School Committee

ROBIN CARLONE
*Chairwoman*
GERALDINE A. LOFFREDO
*Vice Chairwoman*
RICHARD J. DelFINO, JR.
DAVID SANTILLI
PETER VOCCIO, JR.

MICHAEL W. JOLIN PH.D.
*Superintendent of Schools*

# JOHNSTON PUBLIC SCHOOLS

ADMINISTRATION OFFICE
10 MEMORIAL AVENUE
JOHNSTON, RHODE ISLAND 02919-3222

May 1, 2000

Stephen F. Chrabaszcz, Jr.
8 Whittier Drive
Johnston, RI 02919

Dear Mr. Chrabaszcz:

As you know, during a meeting between us and in the presence of Attorney Stephen M. Robinson, on April 12, 2000, I informed you of complaints regarding your professional conduct as Assistant Principal of Johnston High School lodged by both students and staff.

At that time, I also placed you on leave with pay from your position as Assistant Principal of Johnston High School so that I might complete an investigation of these complaints. As my investigation has proceeded, I have been advised by the Johnston School Department's Risk Management Group, The Rhode Island Interlocal Trust, that the nature and pattern of complaints against you by students and staff warrants consideration of an impartial external investigator. At its meeting on May 2, 2000, I will also make a similar recommendation to the Johnston School Committee. As discussed with you on April 12, 2000 the nature of these complaints includes the following:

1. Inappropriate and potentially offensive language used toward a female Johnston High School student

2. Inappropriate and aggressive touching of a male Johnston High School student

3. Failure to adhere to the Johnston School Department's Sexual Harassment Policy by your alleged failure to investigate a sexual harassment complaint made to you by a Johnston High School female student.

Given that these complaints are not totally resolved and that an outside investigation of these will likely be conducted, I must inform you that you must continue on leave with pay from your position as Assistant Principal of Johnston High school. This leave will proceed under the terms and conditions detailed in my correspondence to you dated April 12, 2000.

If you or your attorney should have additional questions regarding this correspondence or related matters, please contact Attorney Stephen M. Robinson at 331-5353.

Sincerely,

Michael W. Jolin

Michael W. Jolin, Ph.D.
Superintendent of Schools

MWJ/mdt

# EXHIBIT B

# JOHNSTON PUBLIC SCHOOLS
# JOHNSTON, RHODE ISLAND

Special Meeting
Tuesday, June 20, 2000

Ferri Middle School Library
7:00 P.M.

## MINUTES

A meeting of the Johnston School Committee was held on Tuesday, June 20, 2000 at 7:00 p.m. in the Johnston High School auditorium.

The meeting was called to order by Robin Carlone, Chairwoman at 7:10 p.m.

PRESENT:
- Robin Carlone, Chairwoman
- Geraldine Loffredo, Vice Chairwoman
- Richard J. DelFino, Jr.
- David Santilli
- Peter Voccio, Jr.

Mrs. Carlone stated that this evenings meeting was based on the School Committee doing its business in public. Mr. Chrabaszcz received a letter on June 6, 2000 stating that the Superintendent was making a recommendation that his contract not be renewed. Mr. Chrabaszcz had two options, hold this meeting in executive session or public session and he chose the public session. It would have been inappropriate at this time to take public comments,

At that point the committee went on with the recommendation of the Superintendent. Attorney Denise Myers was also present .

Attorney Myers stated that there would be no discussion regarding the recommendation of Dr. Jolin, Superintendent. This was a matter, handled in normal fashion, regarding personnel. It was simply a matter where the Superintendent made a recommendation to the School Committee. It was not appropriate for public discussion.

A member of the audience asked the question, "who makes that decision that it was not appropriate to speak". We were told by School Committee members that we would be able to speak on behalf of Mr. Chrabaszcz.

Attorney Myers stated that there would be an opportunity for that at a subsequent hearing. The Superintendent makes a recommendation and the School Committee may accept or not accept that recommendation. At that point the employee of the school department has an opportunity to appeal the School Committee's decision. At that point the public is

invited to make any comments it wishes to make to address the School Committee's decision.

Mrs. Carlone stated that the committee would proceed with the recommendation of the Superintendent.

Dr. Jolin stated, for the record, that this was what is known as a pre-deprivation hearing, not a full hearing. There would be an opportunity to testify on behalf of Mr. Chrabaszcz at another time. You may have been misled. The purpose of this evening's meeting was for the Superintendent to inform the School Committee of a recommendation that he has to make as part of his job. The School Committee has to then either accept or reject that recommendation. Once the School Committee makes its decision, Mr. Chrabaszcz has a right to a full hearing where all the facts are presented and he has a right to call witnesses at that hearing. He then proceeded to make his recommendation. Mr. Chrabaszcz, for the record, has a contract with the Johnston School Department that expires on June 30, 2000. It was his responsibility to either recommend that the contract be extended or not renewed. His recommendation to the School Committee was that the contract not be renewed. The reasons for that recommendation were that Mr. Chrabaszcz has performed in a manner that he believed could be improved upon and that there are other administrators in the State of Rhode Island or anywhere else that we may recruit from, that can do a better job.

Mrs. Carlone cautioned the audience. She stated that any person who was disruptive would be asked to leave the meeting.

Dr. Jolin stated that he didn't want this forum to deteriorate into a discussion of Mr. Chrabaszcz' character or quality. He had a responsibility to say whether or not he could find better people to do the job, that is the standard that he has to judge by. The public may not like it but this was the recommendation that he was making to the School Committee this evening. He believed that if we conducted another search we would find a more qualified person for this job. It was his responsibility to provide excellence to this school system.

Mr. Voccio moved, seconded by Mrs. Carlone to approve the Superintendent's recommendation not to renew the contract of Stephen Chrabaszcz, Assistant Principal at Johnston High School that expires, June 30, 2000.

Discussion followed on this motion.

Mrs. Carlone stated that Mr. Chrabaszcz's attorney, Mr. Stephen Placella had requested to be heard at this point.

Attorney Placella stated that Mr. Chrabaszcz had a statement he wished to read.

Mr. Chrabaszcz addressed the School Committee. He stated that he was a Viet Nam veteran and after Viet Nam he went to Brown University where he received

his B.A. and his Masters Degree. He also received a second Masters Degree from Providence College.

Mr. Chrabaszcz read the following statement:

"For twenty-four years I have gotten up each morning to go to work and do the thing that I do best, work with children. In the twenty-four years I have been very successful at this job. I attribute this to the fact that generally, the teachers like to work with me and the parents appreciate the job that I do. The shining light in my career has always been that the students love me, they know I care for them and that I am there for them. I felt that a dream had come true when I got this job in Johnston. I knew many of the children since they were six years old through instructional baseball. Manyof them are friends of my son, Stephen and daughter, Jess. I was excited about being in Johnston, close to home and my family. I was going to be in charge of discipline and living close to the school would be a plus. I would see students all over town; they would come up to me and say, hello. Some would even come to my house and ask to speak to me about some problem or issue. There have been some difficult moments but none related to the students. There is a great instability in the leadership in Johnston. There have been two Superintendents, three principals, and a new assistant principal. There was a new discipline policy that had to be followed. There was a problem at the beginning of the year with students in the academy concerning hats, which he had to correct. He was the one stable force, the person the parents and students could turn to for help and answers. I addressed some of these discipline problems and asked for an in house school for suspended students at a meeting of the School Committee. I asked that the internet be blocked so that students could not access certain sites. I tried to use my experience to bring about change. I was told to wait until the new Superintendent came on board so that we could make changes. I looked forward to his arrival and that of Mrs. Pitocchi so that we could work together. When they came I felt something was wrong. Dr. Jolin would never talk to me about my contract; he avoided the issue every time I approached him. The only time he mentioned my contract was when he said I was in trouble and this would hurt my chances to be rehired. The new principal acted in the same way. The day after I arrived she moved my office to the other side of the building while keeping the other vice principal near her. She immediately wrote me a letter of reprimand concerning the use of the word, "babe". I use the term, "babe" like other people use the words, dear or hon. I hear teachers and coaches use those terms all of the time. In my case no one ever said not to use this term. The first time I ever heard anything negative about me was when a letter of reprimand was

placed in my file. I never considered the term offensive and I didn't know anyone else did either. If someone had explained to me and made me aware, I would have stopped it but a letter in my file was my only conversation. As far as horsing around with the kids, again, I've always kidded with children, a slap on the back, a shot in the arm, the boys liked it, they would come up behind me and do the same to me. In many cases, they did this for the attention that they received from me. I recently heard a discussion about boys and the fact that they have very few people to talk to and relate to. As a parent I know how busy we can be and many boys spend more time at school than at home. They cannot talk about their problems to anyone. At Johnston, the boys had me and they used this process to get my attention and become friends with me. The final incident involved a fight at the school library which was clearly never my fault but it was an incident which was supposedly the most serious. The girl involved never told me the boy was bothering her. I have worked with sexual harassment cases many times before, I always take action. I was kept out of school for ten weeks, I could not attend the baseball games, the prom, senior activities, graduation, all the things I had worked for and looked forward to. The girl has since left school because of this. Had it been handled correctly, this problem would not have happened to her. My family has been hurt, my son, Stephen graduated from high school, my Jess graduated from 8th grade, my little Adam made his first communion. We celebrated all of these with a terrible cloud over our heads. We will always remember these times with bittersweet memories. At first I truly believed that this was going to be handled quickly as Dr. Jolin promised me. I even went along with the suggestion of the School Committee lawyer and say that I was sick. When my neighbors and the kids were coming up to us and saying, please tell me Mr. Chrabaszcz, does not have cancer, I knew I had to stop this. My wife and I made the decision to go public with this. When my son died, fourteen years ago, the parents and the people of Johnston had an overwhelming support and affection for me and we said then, that we would never leave this town, we love this town. I realize I have ruined my careen in education by this move. It is an unwritten rule among Superintendent's that they call each other when someone applies for a job in their system. I had another job lined up but I lost it last week because of this situation hanging over my head. Next week I will not have a paycheck, no benefits for my family including my son, Adam, who has down syndrome and I have incurred $7,000. In legal fees to defend myself over a harassment case which is truly untrue to save my job. Finally, I have opened up my life to public scrutiny but I did it so that the people in this town will know the truth. In September, I am sure that there will be an assistant principal on board, one that is more polished, quiet and part of the team. I can be sure of one thing however; he will never care for the children like I do. My friend, a priest at Bishop Hendricken, advised me to make it clear to everybody here that I made this session public. I did so to show my children that sometimes you must stand up for what it right even when doing so is very hard. I now ask the School Committee to do the same thing. Do what is right even when it is difficult. Show the children of this town that sometimes people must be made to put aside their differences for the overall good. Show the children in the town that you realize how much I have done for them and will continue to do so. Maybe together, Dr. Jolin, Mrs.

do the same thing. Do what is right even when it is difficult. Show the children of this town that sometimes people must be made to put aside their differences for the overall good. Show the children in the town that you realize how much I have done for them and will continue to do so. Maybe together, Dr. Jolin, Mrs. Pitocchi, Mr. Antonello and I can accomplish great things. I ask that the School Committee support neither, Dr. Jolin nor myself but have us work together for the children of Johnston. It is now your turn to do the right thing".

Mrs. Carlone thanked Mr. Chrabaszcz for his statement. She asked the committee members if they had any comments starting with Mr. DelFino.

Mr. DelFino had a procedural question. In all of the years he had been a member of the School Committee, he had never been asked to vote on a non renewal. He was somewhat concerned and questioned the legality of what was taking place this evening in arriving at this decision. If this committee saw fit not to accept this recommendation of the Superintendent, tell him what happens. If the Superintendent was the only one who can make an appointment and he had a contract that was expiring, tell me what the benefit was to either take this action or not take this action. He said that by us not taking any action, it doesn't resolve this issue for Mr. Chrabaszcz. He had a one year contract that expired in a couple of days but if you don't see fit to reappoint him then what action was before this committee. He suggested that procedurally a non renewal was not the appropriate action before this committee.

Attorney Myers stated that it was her understanding that this was a one year contract that could be renewed upon the recommendation of the Superintendent. Because the Superintendent determines he is not offering a new contract because in his letter he believes there are better administrators available to perform the job. He has made a decision not to renew it. The bottom line was that it was a procedural right that the vice principal had under Laudermill, to allow all of us to understand his same question. It is a very narrow issue that the School Committee has.

Mr. DelFino stated that we have established that in fact, is Mr. Chrabaszcz. We have satisfied him. Now that we have done that, how does that change what was before us? We vote on appointments as a committee based on the recommendation of the superintendent. How do we vote on a non appointment? This was in fact a non appointment, the contract was expiring.

Attorney Myers stated that you are voting that there was an opening.

Mrs. Loffredo agreed with Mr. DelFino. In this state the only person who can appoint someone for a contract would be the Superintendent. Even if the Committee votes against the non renewal of the contract tonight, would that in fact give Mr. Chrabaszcz a job.

Attorney Myers stated that the question was, if the School Committee decided not to take the vote, not accept the recommendation, what happens. Then what happened was, there

Mrs. Loffredo agreed with Mr. DelFino. In this state the only person who can appoint someone for a contract would be the Superintendent. Even if the Committee votes against the non renewal of the contract tonight, would that in fact give Mr. Chrabaszcz a job.

Attorney Myers stated that the question was, if the School Committee decided not to take the vote, not accept the recommendation, what happens. Then what happened was, there was no contract and you have to re address to the Superintendent the issues as to the basis for the non renewal.

Mrs. Loffredo said that clearly by law only the Superintendent can make a recommendation for appointment. The action we take tonight has no bearing on whether Mr. Chrabaszcz gets re-appointed or not because we can't make that decision, only the Superintendent can. Even if we voted to renew his contract, the Superintendent, unless he chose to do that, we could not take that action ourselves.

Attorney Myers replied, that was correct.

Mr. Santilli said that right now, Mr. DelFino and Mrs. Loffredo have opened up a door that he hadn't even thought about. Why were we voting on this?

Mrs. Carlone replied that Attorney Myers has tried to answer that. A position has to be taken to state that there would be a vacancy based on a non renewal.

Mr. Voccio understood Mr. DelFino's and Mrs. Loffredo's point. We have principals in our school system with one, two or three year contracts. He has seen contracts finished after the first year and the Superintendent has brought forth and we have appointed people for two more years or given them a three year contract on the merits of the Superintendent and Superintendent's in the past.

Mr. Voccio said that this was his first experience where it has come to the vote. If it be a vote of the School Committee or it could be that the contract would not renew itself, would automatically cease and there would be no position for any person that has a one or two year contract and the time expired if he/she is not appointed by the School Committee or recommended by the superintendent then that position becomes vacant automatically. However, this was just to confirm the Superintendent's position to bring it to a vote. He didn't know why we had a public hearing, he understood that Mr. Chrabaszcz wanted a public hearing, he understood that there would probably be more hearings in the future. The Superintendent at that time will have to bring up more information if it goes into further litigation that can't be developed here this evening.

Mrs. Carlone said that it was her understanding that this was a housekeeping procedure that has to be done on the floor and we have to have a vote on it. This was what she was told by legal counsel. She stated the following for the record. "Mr. Chrabaszcz, are you the same Stephen Chrabaszcz that singed this employment contract?"

Mr. Chrabaszcz replied, yes he was.

Mrs. Carlone said that it was her understanding that this was a housekeeping procedure that has to be done on the floor and we have to have a vote on it. This was what she was told by legal counsel. She stated the following for the record. "Mr. Chrabaszcz, are you the same Stephen Chrabaszcz that singed this employment contract?"

Mr. Chrabaszcz replied, yes he was.

Mrs. Taylor, School Committee Secretary confirmed that he was that person.

Mr. Stephen Placella, Mr. Chrabaszcz' attorney addressed the School Committee. He stated that Dr. Jolin's notification letter to Mr. Chrabaszcz of June 15, 2000 indicated that in review of his performance he concluded that there were better administrators available. Mr. Chrabaszcz' employment contract that you alluded to and identified as being his signature, page 9 section XIII, indicates an elaborate procedure set out to evaluate Mr. Chrabaszcz. He asked each and every member of the School Committee to look closely at the letter and look closely at that provision in the employment contract. Mr. Chrabaszcz was never evaluated. When each of you have to make a final decision, he asked that the committee make an independent judgement based upon the fact, was he evaluated properly. Look at the contract, look at the letter, look at the obligation.

Dr. Jolin stated that this was a very difficult situation, he didn't ask that he be respected because the people didn't know him that well. He sat here this evening in a public situation trying to do his job for the best interest of every single student in the school system. A question was raised by Mr. Chrabaszcz' attorney, Mr. Placella and he attempted to respond to it. It became necessary for him to place Mr. Chrabaszcz on leave with pay pending the outcome of an investigation as to some supposed acts on Mr. Chrabaszcz' part that may have been unprofessional. It was not possible to complete a full evaluation while he was on that leave. Again, the nature of his recommendation was based on the preponderance of circumstances, Dr. Jolin's past professional experience, his consultation with the principal, acting prior principal and a determination that there were other more qualified administrators available.

Members of the audience shouted out for several minutes.

Mrs. Carlone reminded them that this was the School Committee doing its business in public. Public comments would not be taken this evening because it was a personnel issue. Mr. Chrabaszcz has every right to request an appeal if he is not happy with the way this committee has voted. It is his right and he can exercise that right. She stated that she would not place the School Committee in any violation.

Attorney Myers stated that if anyone tried to disrupt this meeting, they would be asked to leave or the meeting would be suspended until such time as they were quiet. The Agenda does not allow for public discussion, any public discussion would be violation and you would have to go before the Attorney General's Office as witnesses. The vice principal asked for this meeting to be in open session. That does not mean you have the right to question the School Committee or the Superintendent regarding a very narrow issue of a non renewal of a one year employment contract. There are statutory rights that he has and

Attorney Myers stated that if anyone tried to disrupt this meeting, they would be asked to leave or the meeting would be suspended until such time as they were quiet. The Agenda does not allow for public discussion, any public discussion would be violation and you would have to go before the Attorney General's Office as witnesses. The vice principal asked for this meeting to be in open session. That does not mean you have the right to question the School Committee or the Superintendent regarding a very narrow issue of a non renewal of a one year employment contract. There are statutory rights that he has and those will be followed and adhered to by this School Committee. It is inappropriate for anyone to cheer, jeer or clap.

Mr. DelFino said that any action taken by the School Committee is insignificant relative to this situation. Irregardless of what the vote is, it is not going to change what happens to Mr. Chrabaszcz.

Mrs. Carlone stated that we have legal counsel here who has advised us to do that. She is not going to put this committee in any violation and find out later that we had done anything inappropriate regarding the procedure. A recommendation has been made by the Superintendent for a non renewal. A motion has been made by Mr. Voccio and seconded by Mrs. Carlone.

Mrs. Carlone called for a roll call vote.

| | |
|---|---|
| Mr. Voccio | Yes |
| Mr. Santilli | Abstain |
| Mrs. Loffredo | Abstain |
| Mr. DelFino | Abstain |
| Mrs. Carlone | Yes |

The committee went on to the business of extending the bus contract.

Mr. Voccio moved, seconded by Mrs. Carlone to exercise their two year option in extending the bus contract between First Student, Inc. and the Johnston School Department as follows:

> 4% increase for the period July 1, 2000-June 30, 2001 for all rates included in the current contract, with all other contract provisions unchanged.
>
> 3% increase over the 2000-2001 rates for the period July 1, 2001-June 30, 2002.

Unanimous

Mrs. Loffredo moved, seconded by Mr. Voccio to adjourn the meeting.

| | |
|---|---|
| Mr. DelFino | Aye |
| Mrs. Loffredo | Aye |
| Mrs. Carlone | Aye |
| Mr. Santilli | Aye |
| Mr. Voccio | Aye |

The meeting adjourned at 7:50 p.m.

Respectfully submitted,

Martha D. Taylor

Martha D. Taylor, Secretary

# EXHIBIT C

App. Ex. C

FLAHERTY, ORTON & FLAHERTY
ATTORNEYS AT LAW

Francis X. Flaherty
Christopher M. Orton *
Nicole S. Flaherty

Twenty Centerville Road
Warwick, Rhode Island 02886
(401) 737-8700
Fax (401) 737-0735

June 26, 2000

RECEIVED
JUN 27 2000
SUPT'S OFFICE

Michael Jolin, Ph.D.
Superintendent
Johnston Public Schools
10 Memorial Avenue
Johnston, RI 02919-3222

Re: Palumbo complaint

Dear Dr. Jolin:

This correspondence will follow up our telephone conversation of earlier this week. As I indicated in that conversation, I have had no contact from Mr. Palumbo or his daughter, Janice, despite three letters to Mr. Palumbo. In my last correspondence, I indicated that I would be closing my file if I did not hear from them in a timely manner. As we discussed, at this point, I believe it is best that I do just that since I do not feel it would be fruitful to investigate a complaint which the complainant declines to make formally. I have received the enclosed affidavit from Mr. Chrabaszcz's attorney, a copy of which I am enclosing with this correspondence for your review. I believe Steve Robinson already has it.

Please feel free to contact me should you wish to discuss this matter further. I understand that parallel matters are occurring with this case and I would be happy to assist in any way possible.

Very truly yours,

FRANCIS X. FLAHERTY

FXF/eab
Enclosure

* Also Admitted in Massachusetts

STATE OF RHODE ISLAND

COUNTY OF PROVIDENCE

AFFIDAVIT

I, Jeannie M. Bucci, of 26 North Williams Street, Johnston, Rhode Island, first being duly sworn on oath, hereby depose and say:

1. On or about May 5, 2000 at approximately 3:00 p.m., I encountered Janice Palumbo, then a student at Johnston High School, who was sitting in an automobile in front of my home with other adolescents.

2. I have known Janice Palumbo for approximately five years and am familiar with her father.

3. I had recently become aware that she had made an allegation against Johnston High School assistant principal, Stephen Chrabaszcz.

4. I called her aside and I asked her what had happened. She indicated to me that a male student had said something dirty to her at school, that the male student had pushed her in her breast area and in defense, she struck him in the face. She also told me that the high school principal told her that as a result, she would be arrested and charged with assault. She told me that she was afraid of being charged and told the principal that she had told Mr. Chrabaszcz that this boy had been bothering her.

5. I asked her if that was the truth and she told me that the first time she told Mr. Chrabaszcz of the problem was when he interviewed her after the fight. Janice further told me that she had told the principal that she had told Mr. Chrabaszcz of the problem at an earlier time because she was afraid and thought it would help her avoid being arrested and charged.

6. She kept saying to me that she had to say this because she was afraid of being arrested.

Jeannie M. Bucci

STATE OF RHODE ISLAND

COUNTY OF PROVIDENCE

Subscribed and sworn to me in Johnston, this 14th day of June, A.D., 2000.

Notary Public

# EXHIBIT D

*Johnston School Committee*

ROBIN CARLONE
*Chairwoman*
GERALDINE A. LOFFREDO
*Vice Chairwoman*
RICHARD J. DelFINO, JR.
DAVID SANTILLI
PETER VOCCIO, JR.

TOWN OF JOHNSTON, RI INCORPORATED 1759

JOHNSTON PUBLIC SCHOOLS
ADMINISTRATION OFFICE
10 MEMORIAL AVENUE
JOHNSTON, RHODE ISLAND 02919-3222

MICHAEL W. JOLIN Ph.D.
*Superintendent of Schools*

Hand Delivered

June 6, 2000

Mr. Stephen Chrabaszcz
8 Whittier Drive
Johnston, RI 02919

Dear Mr. Chrabaszcz:

Please be advised that at the June 13, 2000 meeting of the Johnston School Committee, I will be recommending that your contract, which terminates on June 30, 2000, not be renewed. The basis of this decision is that after a review of your performance, I conclude there are better administrators available to perform your duties. Accordingly, should the School Committee adopt my recommendation not to renew your contract, your status will no longer be on administrative leave with pay.

Should the School Committee give initial approval to my recommendation, you are entitled to a concise, clear written statement, privately communicated, of the basis or reasons for the non-renewal, and notification of your right to a prompt hearing at your election. You may be represented by counsel at this hearing. Please advise Ms. Martha D. Taylor, Clerk of the School Committee, whether you wish my initial recommendation to be made in public, as is your right. It is the practice of the Johnston School Committee to hold personnel matters in executive session whenever possible. Absent your request for a public discussion, this matter will be held in executive session.

Sincerely,

Michael W. Jolin, Ph.D.
Superintendent of Schools

MWJ/mdt

C: School Committee

RECEIVED
6-8-00 SJR

# EXHIBIT E

# EMPLOYMENT AGREEMENT

This agreement is made by and between the Johnston School Committee ("Committee") and Stephen F. Chrabaszcz, Jr., Assistant Principal ("Administrator").

## PREAMBLE

It is the intention of the parties by the consummation of this Agreement to continue their harmonious relationship, to promote mutual cooperation and understanding, to formulate rules, and to define and resolve the legitimate interest of the Administrator in his/her rights of compensation and conditions under which he/she performs his/her duties. The parties recognize that this process is fully consistent with their mutual goal to improve educational opportunities and special services for the students enrolled in the Johnston Public Schools.

The role of an Administrator as an instructional and/or institutional leader is a vital one. The Administrator shall be the educational leader and shall supervise the operation and management of his/her assigned school or administrative responsibilities and its related school property, subject to the supervision and direction of the Superintendent.

THIS AGREEMENT, made as of August 30, 1999, by and between the School Committee and Stephen F. Chrabaszcz, Jr., the Administrator.

In consideration of the promises herein contained, the parties hereto mutually agree as follows:

I. LENGTH OF CONTRACT:

The Committee hereby employs Stephen F. Chrabaszcz, Jr. as a Johnston School Department administrator for the period beginning August 30, 1999 and ending 30 June, 2000 pending the availability of funding as determined by the Johnston School Department, based upon the Town's appropriation. The work year shall be based on approximately two hundred sixty one (261) days.

II. **DUTIES:**

The Administrator agrees to carry out responsibilities as defined by state laws, regulations of the Board of Regents, policies of the Committee, and the job description established by the Superintendent of Schools with input from the Administrator, The Administrator may be assigned some "system wide" coordinating responsibilities. In so doing, equity of assignments will be a concern considering the different scope of responsibilities of the Administrator.

III. **COMPENSATION:**

The compensation for this position is $67,000 for the budget year, 1999-2000.

1999-2000 base compensation will be used to determine future compensation. Compensation increases will be related to performance pertinent to one's job description, progress in reaching system, school, and/or personal goals and objectives, and professional growth attained by the administrator.

Annually, the Administrator shall provide the Superintendent with a self-evaluation of performance, professional growth, and goal accomplishment. This self-evaluation will result from a careful analysis of data gathered from various constituent groups using a "360 degree" format (i.e. data gathered from colleagues, supervisors, clients and perhaps related "significant others"). "Representatives of the Leadership Team will develop, with the Superintendent, implementation, artifacts and strategies with regard to sections III and XIII of this contract.

The Administrator shall identify one or more goals to be accomplished each school year (goals may have a "window" of more than one (1) year). Future compensation, as well as future base compensation, shall be directly related to the achievement of these goals,

based on a written agreement(s) between the Administrator and the Superintendent which shall annually be appended to this contract.

IV. INSURANCE:

A. MEDICAL AND DENTAL INSURANCE

The Committee shall provide medical and dental insurances consistent with the Certified and Non-Certified Union Contracts. During open enrollment, each Administrator will have the option of choosing within the benefit structures as outlined in the Certified and Non-Certified Union Contracts.

B. LIFE AND LEGAL INSURANCE

The School Committee will offer Term Life Insurance to the Administrator with a face value of $45,000. In addition, the same Legal Expense Insurance Plan will be offered to all Administrators as is currently offered to the Certified Union personnel.

V. LEAVES: *(All leaves unless noted below are to remain the same as provided in the 1998-99 school year, unless subsequent changes occur in either the Non-Certified or Certified Contracts.*
*In the event changes occur to leave policy, in one or both contract with the intent of grouping leave days into one consolidated grouping, such changes will be incorporated into this agreement).*

Note: All leave days may be used as needed in full day or half (1/2) day segments.

A. SICK LEAVE

"Sick leave" changes are effective 7/1/99.

1. Definition:

A sick leave day is defined as a school day (or a portion thereof)

and is taken by an Administrator by reason of that Administrator's physical/psychological inability to perform his/her professional services on the particular day or for other reasons which are enumerated below.

2. Numbers:

Administrators shall receive 18 sick days per year earned at 1½ days at the end of each month and may accumulate such days without limit.

B. ILLNESS IN THE FAMILY

In the event of an illness or an emergency in one's immediate family, the Administrator will receive full pay for a period not exceeding five (5) days in any school year. These days will be deducted from "sick leave."

3. "Sick Leave Bank"

A "Sick Leave Bank" will be established for all administrators who choose to join (at least sixty percent (60%) of those eligible must join for the Bank to be established). For each Administrator who joins, the School Committee will donate two (2) days to the Bank at the time the Administrator enrolls. The enrollees in the Bank will serve as its administering agent, determining the requirements for membership (that is, the number of days to be donated by the Administrator to join the Bank, the frequency of future donations, additional number of days to be donated, etc.). The enrollees will also govern the allocation of days which are awarded to a member for personal illness, but only in the event that this member has no sick days otherwise available. The Committee will keep the Bank's records, including a list of members, the accumulated days in the Bank, and withdrawals. An enrollee form will be developed and it will be completed and signed by the Administrator to join the Bank. For days to be withdrawn from the bank, sixty percent (60%) of the then current members must sign a withdrawal request, directing the Committee to allocate a certain number of days from the Bank to a member in need of personal sick days. The intent of the "Sick Leave Bank" is to provide

additional sick days to an Administrator who suffers from a debilitating, long-term illness.

## C. PERSONAL LEAVE

1. Definition: A personal day is defined as a leave day needed to attend to personal business, which cannot be reasonably accomplished outside of normal work hours.

2. Number: The Administrator shall be granted three (3) personal days per school year.

3. Accumulation: The Administrator may accumulate an unlimited number of such days which shall be added to "sick leave."

4. Utilization: The Administrator may utilize up to three (3) personal days per school year without loss of pay upon direct notification to the Superintendent. Additional days, from sick leave, may be granted at the sole discretion of the Superintendent.

## D. HOLIDAY AND VACATION LEAVE

The Administrator shall be entitled to all holidays recognized by the School System and made available to other School System employees.

The Administrator shall be entitled to twenty (20) paid vacation days each full school year, scheduled with the agreement of the Administrator's immediate supervisor. He/she shall be allowed to accumulate, with no limit, said vacation days commencing in the second year of this agreement. Vacation days are earned at the rate of 1 2/3rds day per month.

All accumulated, unused vacation time will be paid to the Administrator following resignation, retirement or termination at a rate

of pay of fifty percent (50%) of the administrator's per diem rate calculated on a base of 261 days.

E. <u>DEATH IN THE FAMILY</u>

The Administrator who is absent from school due to the death of a father, mother, husband, wife, son, daughter, brother, sister, mother-in-law, father-in-law (or any relative with whom the Administrator might be living) may be absent for up to five (5) days of leave with full pay.

F. <u>DEATH OF A RELATIVE OR FRIEND</u>

In the event of the death of any relative or of a close friend, the Administrator may be absent one (1) day (or that portion of a day) to attend the funeral without loss of pay. This day or half-day will be deducted from "sick leave."

G. <u>COURT LEAVE</u>

There is no limit of leave time with full pay and benefits when an Administrator is called as party defendant or party plaintiff, or as witness under subpoena or to jury duty. However, the Administrator must remit to the School Department all compensation received as a witness or juror.

H. <u>EMERGENCY AND DISCRETIONARY LEAVES</u>

The Administrator may make application for long term emergency or discretionary leave of absence, which may be granted without pay or benefits. The Committee, at its sole discretion, may grant said emergency or discretionary leave of absence.

VI. <u>JOB CONNECTED INJURY:</u>

A. The Administrator shall receive reimbursement for expenses for serious injuries, including assault and battery, sustained during the course of employment.

Said medical expenses shall be reimbursed only for those costs incurred above available medical insurance and any other insurance the Committee may carry on behalf of the Administrator.

B. The Administrator shall be entitled to full pay less any income protection plan which the Committee may carry on behalf of the Administrator. Sick leave shall be deducted only for that time which may not be covered by any income protection plan provided for the Administrator by the Committee.

C. An Administrator on an approved leave of absence for up to one (1) year, related to a job connected injury, must notify the Superintendent's Office by April 15 of the appropriate year of his/her intentions for September of the following school year. Failure to comply with the above shall indicate termination of employment from the Johnston Public Schools effective September 1st of the school year. Notification to the Superintendent's Office must be made by April 15 of the second (2nd) year of approved leave.

## VII PROFESSIONAL GROWTH:

A. The need for continued professional growth on the part of Administrators of the school system is recognized. Growth can be achieved in many ways, such as by completing advanced relevant courses and by attendance at workshops and conferences. At the close of each school year, a written summary and self-evaluation of the professional growth activities engaged in by the Administrator, in compliance with a personal professional growth plan for that year shall be submitted to the Superintendent.

B. The committee shall reimburse the Administrator for the cost of tuition, for any job related course which is approved in advance by the Superintendent and which is successfully completed, in an amount equal to the cost of such course, but such reimbursement shall not exceed $1,000 per year.

C. In addition, the School System shall guarantee to reimburse the Administrator, on a case by case basis, for travel, attendance, and expenses of local, state, and national professional conferences, publications, dues for membership in professional associations, etc., up to $1,000 in any school year, upon submission of written voucher for the same and the prior approval of the Superintendent.

VIII RETIREMENT:

A. STIPEND

Upon retirement from the Johnston Public Schools, the Administrator shall receive $700 for each year of service as an Administrator in the Johnston Public School System. This payment shall not exceed $9,000. Notification must be given to the Superintendent, in writing 90 days prior to the effective date of the retirement, or the benefit may be forfeited (School Committee decision).

B. PAID/LEAVE DAYS

The Administrator, upon retirement, shall be paid seventy five ($75) dollars of each accumulated, unused sick leave day. To the extent permissible by the regulations of the Employee's Retirement System, such severance pay shall be fully includable for retirement computation for the Administrator who is eligible for retirement.

IX CERTIFICATE

The Administrator, when required by law or regulation, shall furnish and maintain throughout the term of this contract a valid and appropriate certificate or a currently approved waiver qualifying him/her to act as an Administrator in Rhode Island for the position he/she is assigned.

X. PROFESSIONAL ACTIVITIES:

The Administrator may accept and be compensated for speaking, writing, lecturing, consulting or other engagements of a professional nature as he/she sees fit, provided they do not interfere with his/her duties.

XI. <u>REIMBURSEMENT FOR EXPENSES</u>:

The Committee shall reimburse the Administrator for all budgeted expenses reasonably incurred in the performance of his/her duties. Some such expenses are: costs of transportation and attendance at appropriate local, state and national meetings and conferences; and, mileage by personal car (exclusive of commute from personal home) at the prevailing IRS rate.

XII <u>SCHOOL COMMITTEE MEETINGS</u>:

At the request of the Superintendent, the Administrator shall attend School Committee meetings and other committees, task forces or work group activities associated with the school system, community, etc. The Administrators will be notified of these meetings in a timely fashion.

XIII <u>EVALUATION:</u>

The Superintendent shall evaluate the performance of the Administrator annually based minimally on the following standards of evaluation: a) relevant language contained in this contract; b) the policies and directives of the Committee; c) the policies and directives of the Superintendent; d) the job description for the position assigned; e) the annual school and individual improvement goals; and f) professional growth. Documented weak performance, an inadequate professional growth plan and/or follow-through, and/or poor fiscal management are some causes for the Superintendent to mandate a plan designed to lead

to satisfactory performance. Failure to achieve the goals of such a plan within a reasonable amount of time may lead to consequences such as non-renewal of this Contract or action to terminate the contract prior to its expiration. The only occasion in which the Superintendent will designate an evaluation of an Administrator to be completed by another Administrator would be in the case of an Assistant Principal being review by the Principal. Generally these evaluations shall be completed between May and August.

No material derogatory to an Administrator's conduct, service, character or personality will be placed in his/her personnel file unless the Administrator has had an opportunity to review such material. Excluded from this condition is material such as confidential references received at the time of the Administrator's initial employment. The Administrator will acknowledge that he/she has had an opportunity to review such material affixing his/her signature to the copy to be filed, with the express understanding that such signature in no way indicates agreement with the contents thereof. The Administrator will also have the right to submit a written answer to such material, and his/her answer shall be reviewed by the Superintendent and attached to the file copy.

An Administrator shall be permitted to inspect the content of his/her personnel folder, and to use the System's copying equipment to make copies of such contents and records as concern his/her work or him/herself. Excluded are documents of a confidential nature received prior to employment.

XIV. <u>TERMINATION AND SUSPENSION</u>:

In the event said Administrator desires to terminate this contract before the term of services shall have expired, he/she may do so without penalty by giving at least sixty (60) days notice of his/her intention to the Superintendent. In the event the Superintendent or the Committee wishes to terminate or severely discipline the Administrator before the term of services shall expire, it may do so provided that its action is not arbitrary, irrational, unreasonable, or irrelevant to the building and maintaining of an efficient school system. The disciplining or termination of an Administrator will be in accord with Rhode Island General Laws section 16-12.1 et seq. ("Administrators' Bill of Rights.") Such an action must not result from a procedure which is inconsistent

with fundamental fairness in process or consequence. Failure to receive a periodic increase in compensation is not to be considered as "severe discipline."

## XV. SOME CAUSES FOR DISMISSAL:

Insubordination, violation of law, immorality, misfeasance or malfeasance, etc. can lead to immediate dismissal. The Johnston School System is not liable to compensate and provide benefits through the end of the contract in such circumstances.

## XVI. INDEMNIFICATION:

The School Committee will fully indemnify an/or defend the Administrator for any and all personal financial loss and expenses, including legal fees and costs, arising out of any claim, action, ward, compromise, settlement, or judgment attributable to any act or omission of the Administrator while acting in good faith within the scope of his/her duties or employment. Such indemnification may be provided by insurance or otherwise.

## XVII. LEGAL SUPPORT

The School Committee shall provide legal counsel at the Administrator's request, and such other support as he/she may request, in the case of grievances or other proceedings instituted against the Administrator for any acts performed in the course of his/her employment.

**XVIII. ENTIRE AGREEMENT:**

This contract embodies the whole agreement between the Committee and the Administrator. There are no inducements, promises, terms, conditions or obligations made or entered into by either party other than those contained herein. This contract may not be changed except in writing and signed by the parties.

8/30/99
Date

Signature, Administrator

9/3/99
Date

Signature,
Johnston School Committee

CERTIFICATION OF SERVICE

I hereby certify that a true copy of the within was mailed, postage prepaid, on this 13th day of July, 2005, to the following:

Jeffrey D. Sowa, Esq. (#5764)
67 Cedar Street, Suite 102
Providence, RI 02903