**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| Stephen F. Chrabaszcz, Jr., et al,<br>Plaintiffs, | : | |
| v. | : | C.A. No. 03-133S |
| Johnston School Committee, both<br>Individually and as Committee Members, et al,<br>Defendants. | : | |

# PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION

Plaintiffs Stephen F. Chrabaszcz, Jr., et al ("Plaintiff") respectfully submit this Memorandum of Law pursuant to R.I. Dist. Ct. R. 12, in opposition to Defendants' Motion for Summary Judgment on Plaintiffs' Complaint, as the affidavits, deposition transcripts, admissions, and evidence on file in this matter demonstrate that there are genuine issues of material fact, which must be resolved by this Honorable Court. As such, Defendants are not entitled to judgment as a matter of law.

## STATEMENT OF FACTS

### Plaintiff's Contract with Johnston School Committee

In or about August 1999, Plaintiff was hired by Defendant Johnston School Committee as a Johnston School Department Administrator. Specifically, Plaintiff was hired to serve as Assistant Principal at Johnston High School. Pursuant to Plaintiff's hiring and contemporaneous therewith, Plaintiff and Defendants entered into an Employment Agreement (hereinafter the "Contract," See Contract, **Defendants' Exhibit E**), the pertinent sections of which are referenced herein.

**Plaintiff is placed on administrative leave**

Plaintiff's Contract was discussed by Defendants in early 2000. Superintendent of Johnston Public Schools Dr. Michael Jolin ("Jolin") met with counsel and reviewed it, realizing that it was subject to renewal at the end of the school year. (See Deposition of David Santilli, attached hereto as **Plaintiff's Exhibit 1**, at p. 24-25). The meeting occurred just three days before Defendants placed Plaintiff on administrative leave. (See Deposition of Michael Jolin, Volume I, attached hereto as **Plaintiff's Exhibit 2**, at p. 39, l. 13.)[1]

Three days later, Jolin informed Plaintiff that he was being placed on administrative leave, pending an "investigation of matters of a confidential nature regarding [his] professional conduct." (See April 12, 2000 Correspondence, attached hereto as **Plaintiff's Exhibit 3**.) Jolin informed Plaintiff that the investigation would only take "a day or two." In addition, Plaintiff was to remain off of Johnston High School premises." (See Deposition of Stephen F. Chrabaszcz, attached hereto as **Plaintiff's Exhibit 4**, at p. 51, l. 18-21.) Three (3) weeks later Jolin provided Plaintiff with an identification of three (3) incidents that were purportedly being investigated. (See May 1, 2000 Correspondence, **Defendants' Exhibit A**.) The three alleged incidents were as follows:

- Inappropriate and potentially offensive language (hereinafter the "First Incident") used toward a female Johnston High School student;
- Inappropriate and aggressive touching (hereinafter the "Second Incident") of a male Johnston High School student; and
- Failure to adhere to the Johnston School Department's Sexual Harassment Policy by your [Plaintiff's] alleged failure to investigate a sexual harassment complaint (hereinafter the "Third Incident") made to you by a Johnston High School female student. Id.

[1] Curiously, and not coincidentally, Jolin developed this course of action subsequent to approaching Ms. Patricia Pitocchi "Pitocchi" (at the time employed in West Warwick and a former colleague of Jolin) to gauge her interest in accompanying him to Johnston. Upon being approached, Pitocchi informed Jolin that she would "think about coming, but Chrabaszcz is a real problem." (See **Exhibit 2**, at p. 32, l. 10-11.) Within three (3) weeks of Pitocchi's arrival, Plaintiff was placed on administrative leave.

**Plaintiff's non-renewal**

On June 6, 2000, Jolin sent Plaintiff correspondence advising him of his plan to recommend non-renewal of his Contract,[2] proffering an explanation that there were "better administrators available." (See June 6, 2000 Correspondence, **Defendants' Exhibit D**, at p. 1.) Thus, Jolin felt that the pending "investigation" of Plaintiff became "moot." (See Transcript, Commissioner of Education Proceedings, Volume I, attached hereto as **Plaintiff's Exhibit 5**, at p. 205). As such, Plaintiff was never notified of its results[3] (See **Exhibit 1**, at p. 54).[4]

**The "Investigation"**

Significantly, the investigation into the First Incident had *concluded* on March 28, 2000 (See Deposition of Michael Jolin, Volume II, attached hereto as **Plaintiff's Exhibit 6**, at p. 28, l. 24, p. 29, l. 1; See Transcript, Commissioner of Education Proceedings, Volume II, attached hereto as **Plaintiff's Exhibit 7**, at p. 145, l. 22-24.) Likewise, the "investigation" of the Second Incident had also *concluded* prior to May 1, 2000. The investigation of the Third Incident was also concluded prior to the end of the school year. (See **Exhibit 1**, at. pgs. 32, 37, 38, 40, 54.) Upon the conclusion of the "investigation," Jolin did not formally clear Plaintiff of the charges nor advise him of the status of the investigation. (See **Exhibit 2**, at p. 86, l. 6-8.)

**Impact of "Investigation"**

Defendants were aware of the innuendo and stigma created by placing Plaintiff on administrative leave and barring him from Johnston High School's premises. (See **Exhibit 1**, at

[2] After a hearing in the Rhode Island Commission of Education, the hearing officer found in favor of Plaintiff, but was subsequently reversed by the Commissioner of Education, a matter which presently remains on appeal.
[3] This notwithstanding the fact that Plaintiff demanded, through counsel, on the record and at his October 3, 2000, hearing before the Johnston School Committee, that his name be formally cleared.
[4] In fact, Defendants' concede that it was fundamentally unfair to never notify Plaintiff of the conclusion of the investigation. (See **Exhibit 1**, at p. 54). Such conduct directly contradicts Section XIV of Plaintiff's Contract.

p. 36; See **Exhibit 2**, at p. 28, l. 4-7). Jolin knew that the community was discussing Plaintiff's situation and placement on administrative leave. (See **Exhibit 6**, at p. 67, l. 9.) Moreover, at a public Johnston School Committee meeting on June 20, 2000, Jolin participated in the discourse himself, publishing defamatory statements concerning Plaintiff to the public when he stated, "[i]t became necessary for [Jolin] to place Mr. Chrabaszcz on leave with pay pending the outcome of an investigation as to some supposed acts on Mr. Chrabaszcz' part that may have been unprofessional." (See Johnston School Committee Meeting Minutes, June 20, 2000 Meeting, attached hereto as **Plaintiff's Exhibit 8**.)

Jolin was also familiar with the Administrator's Bill of Rights and its acknowledgment of the likelihood that innuendo and stigma will result when determining whether to place an individual on administrative leave. (See **Exhibit 2**, at p. 14, l. 5-7.) In fact, Jolin's practice is to balance such expected stigma and innuendo against whether the individual represents a threat to the student body.[5]

After Plaintiff was removed from his position, Jolin received phone calls from Plaintiff's prospective employers (See **Exhibit 6**, at p. 3, l. 14.) Jolin does not recall what he told Plaintiff's prospective employers, but has testified that Plaintiff was among the "very worst administrators." (See **Exhibit 5** at p. 74 l. 11). Plaintiff applied for in excess of one hundred (100) jobs, yet was not hired by anyone. The evidence suggests that Plaintiff's job prospects were adversely affected by Defendants. (See Deposition of Manuel Vinhateiro, attached hereto

---

[5] Jolin testified that he had only used administrative leave for others on five prior occasions, namely, allegations of an employee who exposed himself, a principal using corporal punishment on a student with asthma, a principal having sex with a student, a teacher having sex with students, and a facilities person forgetting about a gas leak in school. (See **Exhibit 2**, at p. 37-38.) Importantly, the three alleged incidents – all resolved – do not, even collectively, rise to the threat level the aforementioned five prior occasions present to the student body, much less independently.

as **Plaintiff's Exhibit 9**; See also Deposition of Deborah Buffi, attached hereto as **Plaintiff's Exhibit 10**, at. p. 15, l. 14-25, p. 16, l.1-12.)

## STANDARD OF REVIEW

Summary judgment is only proper if and only if "the pleadings, depositions, answers to interrogatories, and admissions on the file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)). See also Fritz v. May Dept. Stores Co., 866 F. Supp. 66, 68 (D. R.I. 1994). "A grant of summary judgment 'is not appropriate merely because the facts offered by the moving party seem most plausible, or because the opponent is unlikely to prevail at trial.'" Access Solutions Int'l v. Data/Ware Dev., Inc., 70 F. Supp. 2d 92, 96 (D. R.I. 1999) (quoting Gannon v. Narragansett Elec. Co., 777 F. Supp. 167, 169 (D. R.I. 1991)). Indeed, Defendants must prove that there is no genuine issue as to any material fact and that they are entitled to a judgment as a matter of law. Fritz, 866 F. Supp. at 68. This Court must review the evidence in the light most favorable to the Plaintiff and draw all reasonable inferences in Plaintiffs' favor. Id. (citing Mesnick v. General Elec. Co., 950 F.2d 816, 820 (1st Cir. 1991.)

## I. PROCEDURAL DUE PROCESS

The Fourteenth Amendment to the United States Constitution expressly provides, "nor shall any State deprive any person of life, liberty, or property, without due process of law . . . ." U.S. Const. Amend. XIV. Explicit in its directive is that requirements of due process apply upon the deprivation of an individual's liberty or property rights. It is well settled that these protections apply to the suspension, dismissal, or non-renewal of public school administrators in Rhode Island. See R.I.G.L. § 16-12.1-1.

A. **Plaintiff was deprived of Constitutionally protected property rights, afforded By his Contract with the Johnston School Department.**

1. **Plaintiff's Contract expressly affords an expectation of continued employment in specifying that the Contract will be renewed so long as the goals of his professional growth plan are achieved.**

The United States Supreme Court has made it explicit that "to have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." Bd. of Regents v. Roth, 408 U.S. 564, 577 (1972). Furthermore, as the Fourth Circuit has directed, "in the context of employment in public education, the independent source for the property interest has been said to be a contract which provides for continued employment, which can be terminated only for cause. Thus, only where the employee has a legitimate entitlement to continued employment do the requirements of due process attach." Royster v. Bd. of Trustees, 774 F.2d 618, 620 (4th Cir. 1985) (internal citations omitted).

Although in Roth, the Supreme Court held that the terms of the employee's appointment secured no interest in re-employment for the next year, the facts of this matter are markedly different. Plaintiff's contract specifically affords Plaintiff a continued expectation of employment. Section VII, subsection (A), entitled "Professional Growth" states:

> The need for continued professional growth on the part of the Administrators of the school system is recognized ... At the close of each school year, a written summary and self-evaluation of the professional growth activities engaged in by the Administrator, in compliance with a personal professional growth plan for that year shall be submitted to the Superintendent.

In addition, Section XIII, entitled "Evaluation" states, among other things:

> Failure to achieve the goals of such a plan within a reasonable amount of time may lead to consequences such as non-renewal of this Contract or action to terminate the contract prior to its expiration.

Thus, Plaintiff's Contract implies that so long as the goals set forth in the professional growth plan are achieved, Plaintiff's Contract will be renewed. However, Plaintiff was never afforded an opportunity to present a professional growth plan to Defendants prior to being placed on administrative leave, nor evaluated as guaranteed by his Contract. Instead, he was summarily placed upon administrative leave, constructively terminated and never afforded these rights. In addition, the very inclusion of the professional growth plan expressly evidences an intent for Plaintiff to enjoy a continuing interest. In other words, the parties would not include such a provision – encouraging dialogue between Plaintiff and Defendants – if continued employment was not contemplated. It is uncontroverted that Plaintiff, based upon the plain language of his Contract, enjoys a property interest in continued employment.[6]

Plaintiff was never given a chance to grow and improve as mandated by his contract. As such, by virtue of the Contract language above, a renewal of Plaintiff's Contract was triggered, affording Plaintiff a property right in the renewed Contract. Thus, assuming that this Court agrees with Defendant that pay is the lone property interest that Plaintiff held, then Plaintiff has been deprived of his property right by Defendant's failure to pay Plaintiff during the renewal Contract.

**2. Plaintiff's Contract guarantees Plaintiff due process rights.**

A contract for employment, which expressly affords a benefit, vests a party to the contract with a legitimate claim of entitlement to that benefit. See Royster, 774 F.2d at 620.

---

[6] Minimally, the issue with respect to the interpretation of Plaintiff's Contract as providing for a property interest in continued employment creates a question of material fact. Further, Plaintiff's instant argument is not to be construed as unearthing previous arguments on the issue of Plaintiff's non-renewal. Indeed, the Commissioner of Education, in rendering his Decision, did not entertain jurisdiction with respect to Contract issues, thus a contractually created property interest and Defendants' depriving Plaintiff of the same, is appropriately before this Honorable Court.

Section XIV of Plaintiff's employment contract, entitled "Termination and Suspension" provides:

> " ... The disciplining or termination of an Administrator will be in accord with Rhode Island General Laws, Section 16-12.1 et seq. ("Administrators' Bill of Rights.") Such an action must not result from a procedure which is **inconsistent with fundamental fairness in process or consequence**." (emphasis added.)

Explicit in Plaintiff's Contract is Defendants' intent to afford all terminated administrators procedural and substantive due process protections, by vesting Plaintiff with a legitimate claim of entitlement to procedures of fundamental fairness. Simply put, Defendants' actions wholly undermine the contractual right of fundamental fairness for which Plaintiff bargained.

In deliberately displacing Plaintiff from Johnston High School, delaying the dissemination of any information regarding the alleged investigation, and purposefully holding Plaintiff on administrative leave until the end of the school year (under the guise of investigative purpose), to effectuate constructive termination of Plaintiff was patently unfair and intentional.[7]

**3. Defendants' placement of Plaintiff on administrative leave for all three alleged incidents, despite possessing knowledge that investigation as to two of the three had already concluded, render the administrative leave, at least in part, improperly disciplinary in its effect, and evidence Defendants intent to punish Plaintiff, thus implicating due process concerns.**

Before the option of placing one on administrative leave is entertained, it should be made clear that such leave is for administrative or investigatory purposes and is not in any way disciplinary or punitive, thus ensuring that due process concerns are not implicated. See Johnson v. Indep. Sch. Dist., 494 N.W.2d 270 (Minn. 1992) (holding that a hearing was not required when an educator was suspended with full pay and benefits and informed that it was an administrative suspension which was in no way disciplinary or punitive). See also Pavlik v.

[7] See supra. at §§'s 4, 5 and 6.

Chinle Unified Sch. Dist., 985 P.2d 633, 641 (Ariz. Ct. App. 1999) (holding that due process rights did not attach when administrative leave with pay was for investigatory reasons, and not for disciplinary purposes).

When Jolin placed Plaintiff on "administrative leave" he indicated only that the placement of Plaintiff on administrative leave was pending an "investigation of matters of a confidential nature regarding [his] professional conduct." (See April 12, 2000 Correspondence, attached hereto as **Plaintiff's Exhibit 3**, at p. 1.) Notwithstanding such representation, a full three (3) weeks passed before Jolin provided Plaintiff with an identification of three (3) incidents that were purportedly being investigated. (See May 1, 2000 Correspondence, attached hereto as **Defendant's Exhibit A**, at p. 1.) The three alleged incidents were as follows:

- Inappropriate and potentially offensive language (hereinafter the "First Incident") used toward a female Johnston High School student;

- Inappropriate and aggressive touching (hereinafter the "Second Incident") of a male Johnston High School student; and

- Failure to adhere to the Johnston School Department's Sexual Harassment Policy by your [Chrabaszcz's] alleged failure to investigate a sexual harassment complaint (hereinafter the "Third Incident") made to you by a Johnston High School female student. Id.

Importantly, at no time did Jolin and/or Defendants afford Plaintiff an opportunity to respond to the same. In addition, Defendants ceased any and all investigation into these matters no later than June 26, 2000 (See **Exhibit 2**, at p. 88, l. 8.)

Although Jolin informed Plaintiff that Plaintiff's placement on administrative leave was pending an "investigation," Defendants' own testimony belies such assertion.

First, Jolin testified that the investigation into the First Incident concluded on March 28, 2000 (See **Exhibit 6**, at p. 28, l. 24. p. 29, l. 1), a fact confirmed by Johnston Principal Patricia

Pitocchi. (See **Exhibit 7**, at p. 145, 1. 22-24.). Likewise, any "investigation" into the Second Incident concluded prior to the May 1, 2000 Correspondence issued to Plaintiff. In fact, Jolin has expressly acknowledged that, as of May 1, 2000 - the date Plaintiff finally learned of the purported reasons resulting in his placement on administrative leave - the sole reason Defendants' held Plaintiff on administrative leave was because "Flaherty's (the independent investigator) investigation hadn't been completed yet.[8]" (See **Exhibit 6**, at p. 62, l. 15.) Incredibly, after being advised by the independent investigator that "it would not be fruitful" to continue the investigation, Jolin testified that he did not feel the need to formally clear him of that (Third Incident) charge. (See **Exhibit 2**, at p. 86, l. 6-8.)

Because it is undeniable from the facts that two of the three allegations for which Plaintiff was placed on administrative leave were already *concluded* matters prior to Plaintiff's being placed on administrative leave, Plaintiff was effectively punished in the form of a suspension as a disciplinary measure and deprived his right to due process, including notice and a hearing, in accordance with the Rhode Island Administrator's Bill of Rights. See R.I.G.L. § 16-12.1-1. Indeed, the Administrator's Bill of Rights provides, "the general assembly deems it necessary to the orderly and effective functioning of public education to inform school administrators of the bases or reasons for their suspension, dismissal, or nonrenewal of their employment relationship, and to afford administrators an opportunity to be heard before the school committee." Id. Plaintiff, who has been afforded no such opportunity to be heard before the Johnston School Committee as to his punitive suspensions, has thus been deprived of his Constitutional rights.

---

[8] Despite the facial disingenuousness of his statement at such time, ostensibly, Jolin's assertion can only refer to the Third Incident, since any investigation into the First and Second Incidents had concluded.

**4. Defendants completed their investigation of the Third Incident and failed to reinstate Plaintiff as Assistant Principal, thus effectively suspending and denying Plaintiff his Constitutional rights.**

Defendants have admitted that even though the "investigation" into Plaintiff's alleged conduct was completed[9] and all allegations determined to be baseless, Defendants willfully disregarded the same and elected to keep Plaintiff on administrative leave. (See **Exhibit 1**, at pgs. 32, 37, 38, 40, 54.) In fact, it is undisputed that the "investigation[10]" concluded two weeks prior to the culmination of the school year. Moreover, despite Defendant School Committee Member David Santilli happening upon a "private" meeting between Jolin and School Committee Chairwoman Robin Carlone and insisting that Plaintiff be reinstated to his position, Plaintiff was not reinstated. (See **Exhibit 1**, at p. 33, 34, 35, 54).

Even after Santilli urged Jolin and Robin Carlone to effectuate Plaintiff's return to work, Plaintiff remained on administrative leave, precluded from re-entering Johnston High School's premises. (See **Exhibit 1**, at 33, 38). In fact, Santilli's testimony is undisputed, even by Jolin himself. (See **Exhibit 6**, at p. 63, l. 15, 21.) In short, Defendants continued to maintain the status quo vis-à-vis Plaintiff's administrative leave, with willful, knowing disregard of both its unfairness and derogatory impact upon Plaintiff's reputation, despite such investigation confirming the baselessness of such allegations. (See **Exhibit 1**, at p. 37-38).

The purpose behind Plaintiff's administrative leave was clearly disciplinary and punitive, rather than investigatory in nature and, as such, due process concerns were implicated. Indeed, Plaintiff was continually denied his rights to due process during the time he was placed on

---

[9] As previously addressed, investigation of the First and Second Incidents had already been completed. Assuming *arguendo* that this Honorable Court recognizes Plaintiff's placement on administrative leave to be for "investigative" purposes, despite the conclusion of two of the investigations, there can be no dispute – even drawing all inferences in favor of Defendants – that ALL investigations were concluded at least two (2) weeks prior to the culmination of the school year; thereby rendering the additional time Plaintiff remained on leave, punitive in nature.

[10] Importantly, Plaintiff's purported "failure to investigate a sexual harassment," the Third Incident, stemmed from an alleged incident off of school grounds that had never been formally reported to Plaintiff. (See **Exhibit 7**, at. p.

administrative leave, as he was repeatedly denied an opportunity to fairly contest the allegations, repeatedly denied a hearing on the charges and, above all, was repeatedly deprived of a fair and complete investigation.

**5. Defendants denied Plaintiff baseline rudimentary due process protection, to which Plaintiff is entitled, in connection with Defendants placement of Plaintiff on administrative leave.**

Even assuming Plaintiff was not entitled to a full array of constitutional protections upon being placed on administrative leave, at the very least, rudimentary due process concerns were immediately implicated upon placing Plaintiff on leave, requiring the Johnston School Committee to afford Plaintiff a "fundamentally fair process," including an opportunity to explain why the proposed action should not be taken.

An administrative leave is the equivalent of a suspension with pay, thus implicating rudimentary procedural due process concerns. See Bartell v. Aurora Pub. Schs., 263 F.3d 1143, 1147-48 (10th Cir. 2001); see also 2-6 Educ. Law § 6.09 (Rudimentary due process concerns, thus attach, and should be afforded before placing an employee on administrative leave) (citing Bartell, 263 F.3d at 1147-48 (placing employee on administrative leave did not violate due process where employee was twice given opportunity to respond to allegations against him)).

Quite contrary to this directive, Plaintiff was afforded no opportunity to be heard, no opportunity to explain why the proposed action should not be taken, and no opportunity to clear his name. In fact, for a three week period Plaintiff was left altogether blind to the reasons surrounding his administrative leave. A vague and unsubstantiated explanation, merely informing Plaintiff that he was on leave pending an ongoing investigation, left Plaintiff with no allegations to admit, deny or explain away to help clear his name.

**6. Defendants' action constructively terminated Plaintiff, thereby invoking the protections of the Rhode Island Administrators Bill of Rights.**

It is well settled in Rhode Island under the Administrators' Bill of Rights, R.I.G.L. §16-12.1-1 et seq., that an administrator shall only be terminated for just cause including, but not limited to, declining enrollment or consolidation. In the instant case, Defendants placed Plaintiff on administrative leave and held Plaintiff on administrative leave despite the conclusion of Defendants' investigations into Plaintiff's conduct. Defendants actions in displacing Plaintiff, preventing his return and delaying the release of information clearing Plaintiff's name - until such time as Defendants were able to non-renew Plaintiff - amounted to a improper constructive termination without the presence of just cause, for which Plaintiff was entitled, under the Administrators Bill of Rights, to notice and an opportunity to be heard.

**B. Defendants impinged upon Plaintiff's Constitutionally protected liberty interest, depriving Plaintiff of notice and an opportunity to be heard.**

Separate from the Due Process protections that safeguard an individual's property rights, the Fourteenth Amendment also protects an individual's right to liberty. As the United States Supreme Court has made clear, "[i]n a Constitution for a free people, there can be no doubt that the meaning of 'liberty' must be broad indeed." Roth, 408 U.S. at 572.

Specifically, the Supreme Court has held, "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." Id. at 573 (reasoning that notice and hearing provides an individual with an opportunity to clear his name).

"The liberty protected by the due process clause encompasses an individual's freedom to work and earn a living." Wells v. Doland, 711 F.3d 670, 677 (5th Cir. 1983). "When a public

employer . . . makes charges against [an employee] that might seriously damage his standing in the community or otherwise impose a stigma on the employee that forecloses his freedom to take advantage of other employment opportunities, the employee's liberty interest may be implicated." Id. (citing Board of Regents v. Roth, 408 U.S. 564, 573-75 (1976)).

It is well-settled that "a public employer's action may deprive an employee of a constitutionally protected liberty interest in his or her reputation." Dasey v. Anderson, 304 F.3d 148, 155 (1st Cir. 2002). Indeed, the Fourteenth Amendment protects reputation where (1) government action threatens it, (2) with unusually serious harm, (3) as evidenced by the fact that employment (or some other right or status) is affected." Beitzell v. Jeffrey, 643 F.2d 870 (1st Cir. 1981).

**1. Defendants' allegations against Plaintiff involved an assassination of Plaintiff's character, morality and integrity.**

Defendants insinuation that the allegations brought against Plaintiff addressed only Plaintiff's incompetence is no more than a thinly veiled attempt to cloak the irreparable harm to Plaintiff's character and integrity caused by the same. Defendants contend that Plaintiff's failure to investigate a charge of sexual harassment by a female student, speaks to a claim of incompetence or unsatisfactory job performance rather than constituting an invasive attack upon the morality or honesty of Plaintiff. Nothing is further from the truth.

First, Defendants conveniently fail to address two of the three allegations for which Plaintiff was placed on administrative leave, namely, the First and Second Incidents, which both involved the alleged inappropriate touching, by Plaintiff, of two students. Unquestionably, an allegation of inappropriate touching involves issues far more serious than any relating to competence, as well as issues potentially destructive of one's character.

Moreover, at the moment Jolin placed Plaintiff on administrative leave he advised Plaintiff that "[he was] not to enter Johnston High School and its surrounding properties." By barring Plaintiff from entry onto Johnston High School's premises, Defendants sent a message to the community that Plaintiff had engaged in severe misconduct. Surely individuals who are incompetent or perform their jobs unsatisfactorily are not barred from entering onto the property of their place of employment. Defendants' act of barring Plaintiff from the Johnston High School premises constituted a derogatory statement about Plaintiff's character which was publicly disseminated to the Johnston school community, *ad nauseum*, each day Plaintiff remained barred. In total, every day for seventy nine (79) days, Defendants publicly disseminated information that was harmful to Plaintiff's reputation.

Jolin admitted that the community was discussing Plaintiff's situation and placement on administrative leave. (See **Exhibit 6**, at p. 67, l. 9.)

Finally, at a public Johnston School Committee meeting on June 20, 2000, Jolin participated in the destruction of Plaintiff's reputation himself, by publishing at an open meeting the substance of the allegations for which Plaintiff was placed on administrative leave, namely, "unprofessional" conduct by Plaintiff.

## II. SUBSTANTIVE DUE PROCESS

Apart from the procedural protections afforded by the Fourteenth Amendment to the United States Constitution, the Constitution also affords substantive due process protection when a state's conduct is "conscience shocking." See Rochin v. California, 342 U.S. 165, 169 (1952) ("Due process of law is a summarized constitutional guarantee of respect for those personal immunities which are 'so rooted in the traditions and conscience of our people as to be ranked as fundamental,' or are 'implicit in the concept of ordered liberty." Id. (internal citations omitted)).

In the employment context, a substantive due process claim can be made when a party is wrongfully terminated and can prove that the state has also violated another constitutional right. See Montgomery v. Stefaniak, 410 F.3d 933, 939 (7th Cir. 2005). Moreover, defendant's actions must be "truly irrational" and are "something more than . . . arbitrary, capricious or in violation of state law," to protected by the Federal Constitution. See Weiler v. Purkett, 137 F.3d 1047, 1051 (8th Cir. 1998) (en banc).

Jolin, aware that placing an administrator on administrative leave has a likelihood of creating innuendo and stigma, testified that his practice is to balance such expected stigma and innuendo against whether the individual represents a threat to the student body. However, despite claiming he relied on Interim Principal James DiPrete's opinion (See **Exhibit 6**, at p. 61, l. 4-10) – who candidly testified that he did not consider Plaintiff to be of any threat to the students (See **Exhibit** 7, at p. 61, 7-10.) – Jolin maliciously disregarded the same and exhibited conduct which flies in the face of his "balancing" practice.[11]

Compounding the problem of Defendants' transparently deliberate actions - which damaged and tarnished the Plaintiff independently - was Defendants' exacerbation of the situation by several wholly improper subsequent actions and statements. Despite (1) working with Plaintiff for less than two months; (2) never evaluating him; (3) observing him on only one occasion; (4) disregarding the absence of any adverse reports in his personnel file; and (5) failing to review his stellar credentials, Jolin testified publicly and under other that he rated Plaintiff as "the absolute bottom with possibly one exception" as an administrator. (See Transcript,

[11] In fact, DiPrete, who actually supervised Plaintiff, praised Plaintiff's work ethic and acknowledged that Plaintiff routinely logged twelve (12) to fourteen (14) hour workdays (See **Exhibit 7**, at p. 77 l. 18.) DiPrete indicated that Plaintiff possessed a great deal of compassion and cared very much about the well being of the student body. (See **Exhibit 7**, at p. 79 l. 19.) Notwithstanding, Jolin wholly ignored DiPrete's input, another example of the disingenuousness of Defendants' actions and ill-will towards Plaintiff.

Johnston School Committee, attached hereto as **Exhibit 11**, at p. 34, l. 5-6.) Jolin later testified that Plaintiff was among the very worst administrators. (See **Exhibit 5** at. p. 74 l. 11.)

Moreover, Plaintiff's inability to secure subsequent employment was aggravated by the Defendants' malicious failure to exonerate him of allegations. Exhibiting the truly irrational nature of Defendants' action, Jolin's testimony continues to be that the matter has still not been closed. (See **Exhibit 5**, at p. 199, l. 19-24, p. 200, l. 1-3.)

## III. QUALIFIED IMMUNITY

Although the doctrine of qualified immunity may shield government officials performing discretionary functions from civil liability, the burden of proving application of the same is insurmountable.

The doctrine of qualified immunity will not shield a government official from liability when the party's conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The First Circuit has developed a three-prong test to determine if the doctrine applies. For the doctrine to apply the following requirements must be met: (1) there must be a constitutional violation; (2) the law must be clearly established at the time of the constitutional violation; and (3) a reasonable official, similarly situated, would not have understood that the conduct contravened the established law. Savard v. Rhode Island, 338 F.3d 23, 27 (1st Cir. 2003).

Applying the First Circuit test, it is apparent that Defendants cannot satisfy any prong of the three-part test. First, Defendants have committed a Constitutional violation. See supra. Second, the law must be clearly established at the time of the Constitutional violation. Defendants' were well aware of Plaintiff's property and liberty interests – clearly established rights. Defendants awareness is underscored by Defendants adamantly seeking the advice of

legal counsel prior to acting to displace Plaintiff. Certainly, a reasonable and similarly situated school board would have understood the ramifications of such action.

## IV. BREACH OF CONTRACT

Plaintiff's employment contract has been continually breached through inaction on the part of Defendants and their failure to comply with mandates they specifically imposed.

Plaintiff's employment contract provided specifically for administrator evaluation, yet, in direct contravention of the provision for evaluation, Defendants failed to evaluate Plaintiff's performance. Jolin testimony regarding the failure to evaluate Plaintiff was "[d]epends on what constitutes an evaluation. I believe he had been reprimanded in writing one time. It was a letter of reprimand that I did. Some people may have considered that to be a portion of an evaluation." (See Exhibit 5, at. p. 43). At minimum, Jolin's testimony regarding the evaluation raises a genuine issue of material fact, precluding a grant summary judgment in this matter.

Defendants also failed to indemnify Plaintiff for his attorney's fee, as well as, assist with respect to Plaintiff's professional growth plan. (See supra.)

## V. TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS

To prevail in a claim for tortious interference with contractual relations, a party must prove (1) the existence of a contract, (2) the alleged wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional interference and (4) damages resulting therefrom. Jolicoeur Furniture Co. v. Baldelli, 653 A.2d 740, 752 (R.I. 1995). Under Rhode Island law, a party may in some cases, be charged with intentional interference with a contract to which he is a party himself. See id. For example, the Rhode Island Supreme Court has held that a city's mayor tortiously interfered with a contract to which the city itself was a party. Id.

Defendants' conduct satisfies each and every element of a claim for tortious interference. First, the existence of the Contract is undisputed. Second, Jolin, as Superintendent, certainly possessed knowledge of the same. Third, the record is rife with evidence that Jolin intentionally interfered with Plaintiff's Contract. The injustice in displacing Plaintiff from Johnston High School, delaying the dissemination of any information regarding the alleged investigation, and purposefully holding Plaintiff on administrative leave until the end of the school year, in pocket-veto fashion, to crystallize his constructive termination was patently unfair and intentional. Finally, Plaintiff's resulting damages are well documented as he suffered injury to his reputation and was unable to secure like employment for a substantial period of time.

## VI. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Under Rhode Island law, an employee who has been subjected to intentional infliction of emotional harm may maintain a cause of action when (1) the conduct is intentional or in reckless disregard of the probability of causing emotional distress, (2) the conduct must be extreme and outrageous, (3) there is a causal connection between the wrongful conduct and the emotional distress, and (3) the emotional distress is severe. Swerdlick v. Koch, 721 A.2d 849, 863-62 (R.I. 1998).

Plaintiff has alleged a prima facie case of Intentional Infliction of Emotional Distress. (See Supra. at II., Substantive Due Process.) In addition, Plaintiff has suffered severe emotional distress as a result of Defendants' actions and has treated with medical professionals to alleviate such emotional distress.

## VII. NEGLIGENCE

To prevail on a negligence claim under Rhode Island law, a party must prove (1) a duty, (2) breach of that duty; (3) causation; and (4) damages. Defendants owed a duty to Plaintiff to

act with reasonable care with respect to Plaintiff and his employment. Simply put, Defendants have breached said duty to Plaintiff (See Supra. at I. and II., Procedural and Substantive Due Process, respectively) which has proximately caused Plaintiff to suffer severe and substantial damages.

## VIII. DEFAMATION

To prevail in a defamation claim under Rhode Island law, a plaintiff must prove (1) a false and defamatory statement concerning another; (2) an unprivileged publication to a third party; (3) fault amounting at least to negligence on the part of the publisher; and (4) damages. Budget Termite & Pest Control v. Bousquet, 811 A.2d 1169, 1172 (R.I. 2002).

In the instant case, Plaintiff has alleged a prima facie case of defamation. (See supra., Section I, (B). In addition, Jolin concedes that he received calls from prospective employers of Plaintiff. (See **Exhibit 6**, at p. 3, l. 14.) Ironically, despite applying for "many, many jobs," Plaintiff was unsuccessful in obtaining employment. (See **Exhibit 4**, at p. 25, l. 13) By way of example, Johnston Mayor William Macera informed Plaintiff that he was a "phenomenal candidate for the job in Woonsocket, but Michael Jolin has nixed that job, and you will not get that job in Woonsocket." (See **Exhibit 4**, at p. 26, l. 23-24) The situation also affected job opportunities in East Providence(See Deposition of Manuel Vinhateiro attached hereto as **Exhibit 9**) and Smithfield. (See Deposition of **Exhibit 10**, at p. 15, l. 14-25, p. 16, l. 1-12).

## CONCLUSION

WHEREFORE, Plaintiff Stephen F. Chrabaszcz respectfully requests that this Honorable Court:

(1) Deny Defendants' Motion for Summary Judgment in its entirety; and

(2) Grant such other and further relief as this Court deems just and proper.

Plaintiffs,
By its Attorneys,

Jeffrey D. Sowa, Esq. #5764
Christopher D. DiSano, Esq. #6788
LaPlante & Sowa, Ltd.
67 Cedar Street, Suite 102
Providence, RI 02903
(401) 273-0200 (telephone)
(401) 273-0250 (facsimile)

## CERTIFICATION

Marc DeSisto, Esq.
DESISTO LAW
211 Angell Street
Providence, RI 02906

I hereby certify that on this 31st day of August 2005, I caused a true and accurate copy of the within *Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment* to be sent via first class mail, postage prepaid, to the above-listed attorney.

M. Krakowski