UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

STEPHEN F. CHRABASZCZ, JR., et al. :
:
v. : C.A. No. 03-133S
:
JOHNSTON SCHOOL COMMITTEE, :
et al. :

**REPORT AND RECOMMENDATION**

Lincoln D. Almond, United States Magistrate Judge

**Background**

Before this Court is Defendants' Motion for Summary Judgment (Document No. 45) pursuant to Fed. R. Civ. P. 56. In his Complaint, Plaintiff Stephen F. Chrabaszcz, Jr. ("Plaintiff") alleges, pursuant to 42 U.S.C. § 1983, that Defendants' actions in connection with placing him on administrative leave from his job as Assistant Principal violated his rights to procedural and substantive due process under the Fourteenth Amendment to the United States Constitution. Pursuant to 28 U.S.C. § 1367(a), Plaintiff also seeks to invoke this Court's supplemental jurisdiction over several Rhode Island state law claims. These claims are for breach of employment agreement, tortious interference with contract, intentional infliction of emotional distress, negligence, defamation and loss of consortium.[1]

[1] Plaintiff's wife, Barbara Chrabaszcz, and his children, Stephen F. Chrabaszcz, III, Jessica Chrabaszcz and Adam Chrabaszcz, are also named as Plaintiffs in this action in connection with Count VI (Loss of Consortium). Defendants are the Town of Johnston, its then School Committee (David Santilli, Robert LaFazia, Geraldine Loffredo, Richard Delfino, Robin Carlone and Peter Voccio, Jr.), its then School Superintendent (Michael W. Jolin) and its then High School Principal (Patricia Pitocchi).

Defendants filed their Motion for Summary Judgment and Memorandum of Law (Document No. 45) on July 13, 2005. Plaintiff objected to Defendants' Motion and filed his Opposition and Memorandum of Law (Document No. 58) on September 1, 2005. This matter has been referred to me for preliminary review, findings and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Local R. 32(c). A hearing was held on October 4, 2005. After reviewing the Memoranda submitted, listening to the arguments of counsel and conducting my own independent research, this Court recommends that Defendants' Motion for Summary Judgment be GRANTED in part and DENIED in part, as set forth below.

**Statement of Facts**

Plaintiff was hired by the Johnston School Committee in August 1999 to serve as Assistant Principal of Johnston High School. Plaintiff was employed as Assistant Principal pursuant to an Employment Agreement effective August 30, 1999 between himself and the School Committee (the "Agreement"). The Agreement identified its "length of contract" as "the period beginning August 30, 1999 and ending 30 June, 2000 pending the availability of [school] funding." The Agreement also gave the School Superintendent or the School Committee certain rights to terminate Plaintiff's employment or to "severely discipline" Plaintiff, subject to Rhode Island law, i.e., R.I. Gen. Laws § 16-12.1-1, et seq. (known as the School Administrators' Bill of Rights).[2]

During the 1999-2000 school year, the administrative team at Johnston High School was, to say the least, in a fairly constant state of flux. In addition to Plaintiff's hiring as High School

[2] The School Administrators' Bill of Rights' requirements of "full disclosure" and "an opportunity to be heard" are "ultimately intended to erase harmful innuendo from any suspension, dismissal, or nonrenewal of an administrator." R.I. Gen. Laws §§ 16-12.1-1 and 3.

Assistant Principal, there were several other personnel changes that occurred. A new School Superintendent, Michael Jolin, Ph.D., was hired by the Johnston School Committee in January 2000 and commenced his duties shortly thereafter. Dr. Jolin came to Johnston from a superintendent position with the West Warwick schools. The High School Principal, Cheryl Tutalo, resigned in December 1999. She was replaced in January 2000, on an interim basis, by James Diprete, a veteran Rhode Island administrator/educator. In approximately March 2000, Patricia Pitocchi was hired to replace Ms. Tutalo and took over from Mr. Diprete as Johnston High School Principal. Like Dr. Jolin, Ms. Pitocchi came to Johnston from West Warwick where she was its High School Principal and had worked with Dr. Jolin.

Dr. Jolin testified at his deposition that, before he began as Superintendent in Johnston, he had not met Plaintiff (other than possibly once). (Pl.'s Ex. 2, Jolin Dep. (Vol. I) at 29-30.) However, he indicated that he had "heard a few things" about Plaintiff prior to starting his position in Johnston. (Id. at 30-32.) In particular, Dr. Jolin indicated that when his brother-in-law learned that he was going to Johnston, the brother-in-law asked him to "try and help [Plaintiff] out" and told him that Plaintiff was "crazy," "can be loud" and the brother-in-law thought "he's got problems there." (Id. at 31.) Dr. Jolin also indicated that he was trying to recruit a new high school principal at this same time and approached Patricia Pitocchi, his former colleague in West Warwick, about the position. (Id. at 31-32.) According to Dr. Jolin, Ms. Pitocchi advised him that she would "think about coming, but [Plaintiff] is a real problem." (Id. at 32.) Dr. Jolin indicated that Ms. Pitocchi also advised him that Plaintiff was "crazy." (Id.) Despite these conversations, Dr. Jolin indicated

that he had no preconceived opinion of Plaintiff as an employee and "tried to go into it with an open mind."[3] (Id. at 32-33.)

On or about April 12, 2000, Dr. Jolin informed Plaintiff in person and by letter that he was being placed on administrative leave with pay pending an investigation into "matters of a confidential nature regarding your professional conduct." (See Pl.'s Ex. 3.) Plaintiff was instructed not to enter Johnston High School and its surrounding properties during the period of this leave. The letter did not advise Plaintiff as to the expected duration of this leave.

On May 1, 2000, Dr. Jolin advised Plaintiff by letter that he would be recommending to the School Committee that "an impartial external investigator" be retained to conduct the investigation. (See Defs.' Ex. A.) The letter also sets forth the nature of the three complaints under investigation. The general subject matter of the three complaints is as follows:

> 1. Inappropriate and potentially offensive language ("babe") used toward a female student;
>
> 2. Inappropriate and aggressive/nonsexual touching of a male student; and
>
> 3. Violating the School's Sexual Harassment Policy by failing to investigate a sexual harassment complaint made to Plaintiff by a female student regarding a male student.

---

[3] During the administrative proceedings regarding the nonrenewal issue, Dr. Jolin testified that he only personally observed Plaintiff performing his job duties on one occasion in "March of 2000 when Mrs. Pitocchi came on board" but Dr. Jolin "would rate him among the very worst" administrators with whom he had worked. (Pl.'s Ex. 5, Comm'r of Educ. Hr'g (Vol. I) at 74-75.) Dr. Jolin testified that his poor opinion of Plaintiff was based on a pattern of complaints about Plaintiff. (Id. at 74.) Although Mr. Diprete, the Acting Principal who worked with Plaintiff from January to March 2000, testified that he met with Dr. Jolin on February 10, 2000 to discuss "any shortcomings...in [Plaintiff's] abilities," he indicated that it "never occurred to [him]" that Plaintiff posed a danger to students, and he had "no basis" to reach that conclusion. (Pl.'s Ex. 7, Comm'r of Educ. Hr'g (Vol. II) at 60-61.)

(Id.) Finally, Plaintiff was advised that he "must continue on leave with pay" because "these complaints are not totally resolved and...an outside investigation of these will likely be conducted." (Id.)

In consultation with legal counsel and the Town's insurance carrier, Defendants hired Attorney (now Rhode Island Supreme Court Justice) Francis X. Flaherty to investigate the allegation that Plaintiff had failed to adequately investigate a sexual harassment complaint allegedly lodged by a female student against a male student. Attorney Flaherty was not retained to investigate the other two issues. By letter dated June 26, 2000, Attorney Flaherty advised Dr. Jolin that he was closing his file "since I do not feel it would be fruitful to investigate a complaint which the complainant declines to make formally." (See Defs.' Ex. C.) Attorney Flaherty also transmitted an affidavit dated June 14, 2000 to Dr. Jolin which was received from Plaintiff's attorney and suggested that this particular allegation regarding Plaintiff was fabricated.

On June 6, 2000, Dr. Jolin informed Plaintiff by letter that he would be recommending to the School Committee that they not renew Plaintiff's Agreement which was expiring on June 30, 2000. (See Defs.' Ex. D.) Dr. Jolin indicated that the reason for his recommendation was his conclusion that there were better administrators than Plaintiff available to act as Assistant Principal. Plaintiff was also advised of his right to formal notice and a hearing (see R.I. Gen. Laws § 16-12.1-3) if the School Committee gave "initial approval" to Dr. Jolin's recommendation and that such hearing would be held in "executive session" unless Plaintiff requested "public discussion." (Id.)

On June 20, 2000, the School Committee held a special meeting to act on Dr. Jolin's nonrenewal recommendation. The meeting was held in public, not executive session, at Plaintiff's

request. The minutes reflect that Dr. Jolin presented his recommendation and stated that "[t]he reasons for that recommendation were that [Plaintiff] has performed in a manner that he believed could be improved upon and that there are other administrators in the state of Rhode Island or anywhere else that we may recruit from, that can do a better job." (Defs.' Ex. B at 2.) This statement was made by Dr. Jolin, according to the minutes, prior to any statement being made at the meeting by or on behalf of Plaintiff. (See id.)

After Dr. Jolin's nonrenewal recommendation was moved and seconded by members of the School Committee, there was a period of discussion that started with Plaintiff reading a prepared statement. Plaintiff's statement responded in detail to the three allegations which prompted Plaintiff's paid administrative leave and he, in essence, asked the School Committee to reject Dr. Jolin's nonrenewal recommendation. (Id. at 3-5.) This was followed by a discussion among the School Committee members and the Committee's attorney regarding procedure and a further statement by Dr. Jolin that it "became necessary for him to place [Plaintiff] on leave with pay pending the outcome of an investigation as to some supposed acts on [Plaintiff's] part that may have been unprofessional" and that "[i]t was not possible to complete a full evaluation [of Plaintiff's job performance] while he was on that leave." (Defs.' Ex. B at 7.) Ultimately, the School Committee voted on the nonrenewal and it was approved (two yes votes and three abstentions). (Id. at 8.)

After the June 20, 2000 public hearing, Plaintiff exercised his right under R.I. Gen. Laws § 16-12.1-6 to appeal the nonrenewal of his Agreement for the 2000-2001 school year. The matter is currently pending before the Rhode Island Board of Regents for Elementary and Secondary Education (the "Board of Regents"). Plaintiff is not challenging the nonrenewal of his Agreement

in this action, he is only challenging the Defendants' actions in connection with his administrative leave.

**Summary Judgment Standard**

A party shall be entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When deciding a motion for summary judgment, the Court must review the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. Cadle Co. v. Hayes, 116 F.3d 957, 959 (1st Cir. 1997).

Summary judgment involves shifting burdens between the moving and the nonmoving parties. Initially, the burden requires the moving party to aver "an absence of evidence to support the nonmoving party's case." Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548, 2554, 91 L. Ed. 2d 265 (1986)). Once the moving party meets this burden, the burden falls upon the nonmoving party, who must oppose the motion by presenting facts that show a genuine "trialworthy issue remains." Cadle, 116 F.3d at 960 (citing Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995); Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994)). An issue of fact is "genuine" if it "may reasonably be resolved in favor of either party." Id. (citing Maldonado-Denis, 23 F.3d at 581).

To oppose the motion successfully, the nonmoving party must present affirmative evidence to rebut the motion. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256-57, 106 S. Ct. 2505,

2514-2515, 91 L. Ed. 2d 202, (1986). "Even in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, [or] unsupported speculation." Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990). Moreover, the "evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve." Id. (quoting Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179, 181 (1st Cir. 1989)). Therefore, to defeat a properly supported motion for summary judgment, the nonmoving party must establish a trialworthy issue by presenting "enough competent evidence to enable a finding favorable to the nonmoving party." Goldman v. First Nat'l Bank of Boston, 985 F.2d 1113, 1116 (1st Cir. 1993) (citing Anderson, 477 U.S. at 249).

**Analysis**

Plaintiff brings suit under 42 U.S.C. § 1983. To prevail on a claim under Section 1983, Plaintiff must establish that: (1) Defendants acted under color of state law; and (2) Defendants' challenged conduct deprived Plaintiff of a right secured by the U.S. Constitution or a federal statute. See West v. Atkins, 487 U.S. 42, 48 (1988). In this case, Plaintiff contends that Defendants violated his rights under the Fourteenth Amendment of the U.S. Constitution, which prohibits a state actor from depriving "any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV, § 1. This due process clause has been interpreted to encompass protection of both procedural and substantive due process rights. Procedural due process focuses on the procedures used by a state actor, while substantive due process examines the underlying state action without

regard to the sufficiency of the procedures utilized. See DePoutot v. Raffaelly, 424 F.3d 112, 118 (1st Cir. 2005).

Plaintiff alleges that Defendants' actions violated both his procedural and substantive due process rights. Defendants dispute Plaintiff's due process claims and also contend that they have qualified immunity from liability for such claims. Because Defendants asserted a qualified immunity defense at the summary judgment stage in this Section 1983 action, Supreme Court precedent instructs that the court must first determine whether a genuine issue of material fact exists as to the claimed violation of Plaintiff's constitutional due process rights. Saucier v. Katz, 533 U.S. 194, 201 (2001) (initial inquiry is whether "[t]aken in the light most favorable to the [plaintiff], do the facts alleged show [defendant's] conduct violated a constitutional right?"). If such a "trialworthy" issue exists, the court then moves on to the traditional elements of qualified immunity: (1) fair warning, i.e., was the right clearly established; and (2) whether a reasonable, similarly situated official would have understood that the challenged conduct violated such clearly established law. See Brosseau v. Haugen, 543 U.S. 194 (2004); and Savard v. Rhode Island, 338 F.3d 23, 27 (1st Cir. 2003). Accordingly, the Court will first address the merits of Plaintiff's due process claims before turning to the issue of qualified immunity.

## I. Procedural Due Process

"The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property." Board of Regents v. Roth, 408 U.S. 564, 569 (1972). Thus, the first task is to determine if Defendants' conduct deprived Plaintiff of a protected liberty or property interest.

### A. The Property Interest Claim

To have a property interest, an individual must be entitled to a benefit or right created and defined by "an independent source such as state law." Roth, 408 U.S. at 577. Defendants do not dispute that Plaintiff had a property interest in his former position of Assistant Principal pursuant to the Agreement and state law (R.I. Gen. Laws § 16-12.1-1, et seq.). Rather, Defendants argue that there is no evidence that Plaintiff was deprived of that right and, at least with respect to nonrenewal, Plaintiff is receiving all the process he is due in connection with his pending state law nonrenewal challenge.

#### 1. Property Interest in Continued Employment

Plaintiff argues that the Agreement "expressly affords [him] an expectation of continued employment." (Pl.'s Mem. at 6.) However, reviewing the Agreement in a light most favorable to Plaintiff, any such expectation on Plaintiff's part is unreasonable, unilateral and unsupported by the Agreement's unambiguous terms. The Agreement could not be any clearer that Plaintiff's employment was "for the period beginning August 30, 1999 and ending 30 June, 2000." (Defs.' Ex. E at 1 (emphasis added).) While certain terms of the Agreement recognized the potential for extension or renewal, the Agreement cannot reasonably be construed to guarantee or create a property interest in employment after June 30, 2000.

It is undisputed that Plaintiff's Agreement was not renewed or extended for the 2000-2001 school year. To the extent Plaintiff had any property interest in renewal under either the Agreement or state law, he has received procedural due process. Pursuant to R.I. Gen. Laws § 16-12.1-3, Plaintiff was given written notice of the reasons for nonrenewal and hearings before the School

Committee on June 20, 2000 and October 3, 2000. It appears from the transcript of the October hearing that a total of thirteen witnesses (including Plaintiff, Dr. Jolin and Ms. Tutalo) testified, and a total of fourteen exhibits were received into evidence (eleven introduced by Dr. Jolin and three by Plaintiff). Plaintiff has exercised his appeal rights under R.I. Gen. Laws § 16-12.1-6 and the matter is apparently still pending before the Board of Regents.

The facts in this case are remarkably similar to those considered by the Supreme Court in Roth, 408 U.S. 564. In Roth, the plaintiff was a nontenured assistant professor at a public university who had a one-year contract of employment ending on June 30. The Supreme Court held that the plaintiff had no property interest in renewal of his contract for the next academic term and thus no right to procedural due process. Id. at 577-78. Although the Supreme Court recognized that nonrenewal may implicate a protected liberty interest in certain circumstances, it concluded that those circumstances did not exist because no stigmatizing charges were made in connection with the nonrenewal. Id. at 573. As in Roth, Plaintiff's Agreement in this case gave him no property interest in renewal. While Plaintiff may have had property rights created under R.I. Gen. Laws § 16-12.1-1, et seq., it is undisputed that he has been given due process in connection with the ongoing state nonrenewal proceedings.

**2. Property Interest During Administrative Leave**

In addition to his claim of an expectation of continued employment beyond June 30, 2000, Plaintiff also contends that his placement on paid administrative leave on April 12, 2000 infringed upon a protected property interest. It is undisputed that Plaintiff received his full salary and benefits during his administrative leave and through the end of his employment term on June 30, 2000. This

Court is hesitant to find that a fully paid administrative leave can result in deprivation of a protected property interest. Paid administrative leave is a valuable and often necessary management tool in certain circumstances to balance an employee's interests with the needs of an employer to ensure workplace or public safety. For instance, if a school teacher or administrator was accused of child molestation, it would certainly be prudent for a superintendent or school committee to place that individual on paid administrative leave pending further investigation to ensure student safety. In fact, in Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 546, 544-45 (1985), the Supreme Court intimated that a suspension with pay was a permissible mechanism to balance such interests and also satisfy the demands of procedural due process.

In this case, Plaintiff was on paid administrative leave for approximately two months, and there has been no evidence presented by Plaintiff that he was deprived of any salary or other tangible benefits during this period. Further, Plaintiff has not identified anything in the Agreement or under state law which prohibited Defendants from placing him on paid administrative leave. The great weight of authority reviewed by this Court holds that "any constitutionally protected property interest [a public employee] ha[s] as a result of his employment contract has been satisfied by payment of the full compensation due under the contract." Royster v. Bd. of Trustees, 774 F.2d 618, 621 (4th Cir. 1985). See also Pitts v. Bd. of Educ., 869 F.2d 555, 556 (10th Cir. 1989) ("suspension with pay d[oes] not invade any recognized property interest."). Although Plaintiff had a property interest in continued employment prior to June 30, 2000, such interest did not "extend to the right to possess and retain a particular job or to perform particular services." Fields v. Durham, 909 F.2d 94, 98 (4th Cir. 1990) (citations omitted). In other words, the command that Plaintiff not report to work did not

deprive him of any protected property interest. For instance, in Santiago v. Fajardo, 70 F. Supp. 2d 72, 74-75 (D.P.R. 1999), a tenured public school teacher was "summarily suspended from work with pay" for approximately two months during the school year. The District Court concluded that this paid suspension was "not tantamount to a deprivation subject to due process guarantees" and entered summary judgment against the plaintiff. Id. at 75. See also Bennett v. City of Boston, 869 F.2d 19, 22 (1st Cir. 1989) (no due process concerns raised by paid suspension of public safety employee following arrest for receiving stolen property).

Finally, Plaintiff attempts to sidestep this precedent by arguing that his administrative leave was "improperly disciplinary in effect" and resulted in a "constructive termination" invoking the protections of the Rhode Island Administrators' Bill of Rights. Plaintiff has offered no legal precedent supporting this argument. In addition, this argument has no support in the Agreement or under state law, i.e., the School Administrators' Bill of Rights. Although Plaintiff argued this "constructive termination" theory in his state nonrenewal case, the Commissioner of Education rejected it as a matter of state law and ruled that:

> [i]f the School Committee retains an administrator in employment for the entire term of his/her contract, even if on paid leave, and then fails to renew the administrator's contract, this amounts to a contract nonrenewal not a termination during the term of the contract requiring that just cause be established by the employer.

Decision of Commissioner McWalters dated Jan. 28, 2005, Conclusion of Law No. 3 at p. 9. (emphasis added). Regardless of the label used by Plaintiff, he has simply not offered any support for his argument that his placement on paid administrative leave deprived him of a property interest protected under Rhode Island law.

For the reasons discussed above, Plaintiff has offered no evidence establishing the deprivation of a protected property interest in the absence of procedural due process. Thus, this Court recommends that Defendants' Motion for Summary Judgment be GRANTED as to Plaintiff's procedural due process claims related to claimed property interests.

**B. The Liberty Interest Claim**

Plaintiff additionally contends that Defendants' conduct, including the overall circumstances of his paid administrative leave, impinged upon a constitutionally protected liberty interest, and improperly deprived him of notice and an opportunity to be heard. As noted above, the Supreme Court in Roth held that a liberty interest could be implicated in connection with a nonrenewal if done in connection with a "charge against [a public employee] that might seriously damage his standing and associations in his community." 408 U.S. at 573. It held that "where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential" in order to "provide the person an opportunity to clear his name." Id. at 573 and n.12. (citations omitted). Finally, the Supreme Court noted that after such name-clearing hearing, the "employer, of course, may remain free to deny [the person] future employment for other reasons." Id. at n.12.

It is well established that "defamation, even from the lips of a government actor, does not in and of itself transgress constitutionally assured rights." Pendleton v. City of Haverhill, 156 F.3d 57, 62-63 (1st Cir. 1998). However, the First Circuit has held that there are circumstances in which a public employer's decisions regarding employment status "may damage the employee's reputation to such an extent that his 'liberty' to seek another job is significantly impaired." Ortega-Rosario v.

Alvarado-Ortiz, 917 F.2d 71, 74 (1st Cir. 1990). In particular, it has been held that due process requires a public-sector employer to provide its employee with a hearing "where [the] employer creates and disseminates a false and defamatory impression about an employee in connection with the employee's discharge." Wojcik v. Mass. State Lottery Comm'n, 300 F.3d 92, 103 (1st Cir. 2002), citing Roth, 408 U.S. at 573. The purpose of this so-called "name-clearing" hearing is to provide the employee with "an opportunity to dispute the defamatory allegations." Id., citing Codd v. Velger, 429 U.S. 624, 627-28 (1977).

In order to prevail on a claim for deprivation of a liberty interest without due process, Plaintiff must satisfy five elements. See Wojcik, 300 F.3d at 103. The First Circuit has recently reiterated these five elements in detail. Burton v. Town of Littleton, 426 F.3d 9 (1st Cir. 2005). In Burton, these five elements were described as follows:

> (1) the alleged statements must level a charge against the employee that might seriously damage his standing and associations in the community and place his good name, reputation, honor or integrity at stake;
>
> (2) the employee must dispute the charges made against him as false;
>
> (3) the stigmatizing statements or charges must have been intentionally publicized by the government, [i.e.,] aired in a formal setting and not the result of unauthorized leaks;
>
> (4) the stigmatizing statements must have been made in conjunction with an alteration of the employee's legal status, such as...termination of...employment; and
>
> (5) the government must have failed to comply with the employee's request for an adequate name-clearing opportunity.

426 F.3d at 15 (citations omitted). Thus, the initial question before this Court is whether Defendants have shown, viewing the evidence in the light most favorable to Plaintiff and drawing all reasonable inferences in his favor, that no genuine "trialworthy issue remains" as to these five elements. Cadle, 116 F.3d at 960. An issue of fact is "genuine" if it "may reasonably be resolved in favor of either party." Maldonado-Denis, 23 F.3d at 581.

The facts in this case do not fit neatly into the box of a strict nonrenewal case. Plaintiff's nonrenewal after June 30, 2000 took place in the context of the unresolved administrative leave. In view of the nonrenewal decision, Defendants contend that the investigation of the allegations which initially prompted the leave became moot, and the investigation was thus properly discontinued. In contrast, Plaintiff contends that the circumstances of his administrative leave, including the requirement that he not enter the "High School and its surrounding properties," and the lack of any closure to the matter, had the effect of "blacklisting [him] from employment in comparable jobs." Colaizzi v. Walker, 812 F.2d 304, 307 (7th Cir. 1987). Put simply, the issue is whether Defendants had any constitutional obligation to grant Plaintiff a name-clearing hearing regarding the complaints which prompted the administrative leave or to otherwise bring the investigation of such complaints to some formal conclusion.

In his decision in the nonrenewal case, Commissioner of Education McWalters rejected Plaintiff's arguments regarding the administrative leave and ruled that it was simply not relevant to the issue of nonrenewal. (Decision of McWalters (Jan. 28, 2005) at 11.) In particular, although he noted the concerns raised by Plaintiff "regarding damage to reputation linked to this unconcluded investigation," the Commissioner held that since the nonrenewal decision was not based "upon any

investigation or allegations but rather is based upon the belief of [Dr. Jolin] that a more qualified administrator could be employed, any investigation conducted or not conducted...is moot for [nonrenewal] purposes." Id. Commissioner McWalters concluded that he had no jurisdiction under "school law" to consider Plaintiff's claims relating to reputation but noted that "such claims may be cognizable in another forum." Id.

A nonrenewal based solely on the reason of "better administrator available" can reasonably imply that the nonrenewed administrator's performance was nonetheless adequate. However, under the peculiar circumstances of this case, Plaintiff's nonrenewal clearly did not have such a benign implication. Plaintiff's nonrenewal was preceded by an administrative leave and banishment from school grounds. At the hearing, Defendants' counsel indicated that the Town took steps to "protect" Plaintiff, such as suggesting that he "tell people he was out sick." Plaintiff is a resident of Johnston and, at the time, had a child in the Town's school system. The "sick leave" suggestion hardly seems workable, given Plaintiff's visibility in the Town and because the leave ultimately extended through the entire school year. The suggestion may have led members of the community to wrongfully believe that Plaintiff was suffering from some form of serious or life-threatening illness.[4] Alternatively, if Plaintiff was observed leading a "normal" life while purportedly on sick leave, it may have led members of the community, i.e., taxpayers, to erroneously believe that Plaintiff was malingering.

---

[4] At the June 20, 2000 School Committee meeting, Plaintiff indicated that he initially went along with the sick leave "suggestion" made by the School Committee's lawyer because he believed the matter would be resolved "quickly" by Dr. Jolin. Plaintiff indicates he was initially informed by Dr. Jolin that the investigation would only take a "day or two." (Pl.'s Mem. at 2.) However, as time passed and members of the community were asking – "please tell me [Plaintiff] does not have cancer," Plaintiff abandoned the sick leave story. (See Defs.' Ex. B, Minutes of June 20, 2000 meeting at p. 4.)

As will be discussed below, this Court concludes that genuine issues of material fact exist as to each of the elements of a liberty interest claim when all of the evidence is viewed in a light most favorable to Plaintiff and all reasonable inferences are drawn in his favor. The first three Wojcik elements require an analysis of the allegedly stigmatizing statements. Allegations made by a public employer will invoke a right to a name-clearing hearing "when they denigrate the employee's competence as a professional and impugn the employee's professional reputation in such a fashion as to effectively put a significant roadblock in that employee's continued ability to practice his or her profession." Donato v. Plainview-Old Bethpage Cent. Sch. Dist., 96 F.3d 623, 630-31 (2nd Cir. 1996) (citations omitted). The allegations made by Dr. Jolin in his letters to Plaintiff of April 12, 2000 and May 1, 2000 could reasonably be construed as stigmatizing by a finder of fact. The allegations go to the heart of Plaintiff's professional competence and judgment. Although these letters themselves were not publicized, they resulted in Plaintiff's conspicuous and lengthy absence from work and banishment from school grounds. In addition, Plaintiff alleges that Dr. Jolin made a number of public remarks regarding him. For instance, at the June 20, 2000 School Committee meeting regarding Dr. Jolin's nonrenewal recommendation, Dr. Jolin stated publicly that Plaintiff's contract should not be renewed, in part, because Plaintiff had "performed in a manner that he believed could be improved upon" and he also stated that he did not want "this forum to deteriorate into a discussion of [Plaintiff's] character or quality." (Defs.' Ex. B, Minutes at 2.)

Later in the June 20, 2000 meeting, Dr. Jolin made further public comments that it became "necessary for him to place [Plaintiff] on leave with pay pending the outcome of an investigation as to some supposed acts on [Plaintiff's] part that may have been unprofessional." (Defs.' Ex. B,

Minutes at 7.) (emphasis added). Although it is true that Plaintiff himself publicized the allegations in a statement he read at the meeting, this meeting did not occur in a vacuum. A reasonable finder of fact may conclude that Plaintiff's statement at the meeting was compelled by his ongoing and conspicuous absence from work and school grounds, Dr. Jolin's public nonrenewal recommendation and/or Dr. Jolin's initial public criticism at the meeting regarding Plaintiff's performance and qualifications. Dr. Jolin also had expressed his desire that the June 20, 2000 meeting not "deteriorate into a discussion of [Plaintiff's] quality or character." Again, a reasonable fact finder could conclude that Dr. Jolin's use of the word "deteriorate" implied that he would not have had positive things to say about Plaintiff.

Finally, at the October 3, 2000 due process hearing regarding nonrenewal which was governed by the "better administrators available" standard, Dr. Jolin was questioned on direct examination by the School Committee's lawyer about the May 1, 2000 letter which outlined the reasons for placing Plaintiff on administrative leave. (See Pl.'s Ex. 11, Tr. of Oct. 3, 2000 Public Hr'g at 31.) The letter itself was an exhibit offered by the School Committee, and Dr. Jolin offered his opinion that Plaintiff "presented a significant liability to the School Committee, myself and could be detrimental or was detrimental to the students." (Id. at 31-32 (emphasis added).)

Plaintiff also alleges that Defendants publicized defamatory comments about him to prospective employers. See Ortega-Rosario, 917 F.2d at 74-75 (liberty interest may be impinged by dissemination to prospective employers). Although Plaintiff does not have a smoking gun, he has circumstantial and other evidence sufficient to avert summary judgment. For instance, Dr. Jolin admitted speaking to at least one or two prospective employers about Plaintiff. (Pl.'s Ex. 6, Jolin

Dep. (Vol. II) at 3.) Although he remembered describing Plaintiff as "hardworking and energetic," he could not "recall" what else he may have said about Plaintiff. Id. at 4. However, in other forums, Dr. Jolin offered his opinion that Plaintiff was "among the very worst" administrators he had worked with (Pl.'s Ex. 5, Tr. of Dep't of Educ. Hr'g at 74); and "[t]he absolute bottom with possibly one exception." (Pl.'s Ex. 11, Tr. of Oct. 3, 2000 Public Hr'g at 34.)

Plaintiff also offered the testimony of East Providence School Administrator Manuel F. Vinhateiro, Jr. who was involved in reviewing Plaintiff's unsuccessful candidacy for two vacant assistant principal positions. Mr. Vinhateiro testified that he was "fully supportive" of Plaintiff's application until he "found out by accident that there was a cloud," (Pl.'s Ex. 9, Vinhateiro Dep. at 10), and he indicated that "word came back...that [Plaintiff] was under suspension for something that had gone wrong in Johnston." (Id. at 12.) Mr. Vinhateiro also indicated that he was aware of Plaintiff's reputation in the education community and believed that Plaintiff was "an excellent administrator" prior to learning about the Johnston situation. (Id. at 16-17.) Finally, Plaintiff testified about a conversation he had with the Mayor of Johnston in July 2000 regarding a potential employment opportunity in Woonsocket, in which the Mayor told him that Dr. Jolin "ha[d] nixed that job, you will not get that job [assistant high school principal] in Woonsocket" despite being a "phenomenal candidate" for the job. (Pl.'s Ex. 4, Pl.'s Dep. at 26-27.)

With regard to the mechanism of administrative leave, Dr. Jolin testified that he was aware that placing an individual on such leave can result in harmful "rumor and innuendo" and factored this into the balance when making such decisions. (Pl.'s Ex. 2, Jolin Dep. (Vol. I) at 28-29.) Dr. Jolin testified that he had used this mechanism on five prior occasions in his career, i.e., allegations

involving a teacher who imposed corporal punishment (push ups) on a fourth grader with asthma, an employee who exposed himself, a principal having sex with a student, a teacher having sex with students, and a facilities person who forgot about a gas leak. (Id. at 37-38.) Plaintiff contends that the allegations made about him do not rise to the level of those prior instances and that Dr. Jolin had no rational basis to conclude that Plaintiff presented a danger to students such that, in Dr. Jolin's words at the June 20, 2000 School Committee meeting, "it became necessary" to place Plaintiff on administrative leave.

In addition to disputing the underlying allegations, Plaintiff disputes that those allegations were the real reason for his administrative leave. He contends that the alleged incidents were either "outdated and/or pretextual" and were part of a "scheme" to get Plaintiff out of the school. In support of this argument, Plaintiff points to the conversation between Dr. Jolin and Ms. Pitocchi regarding her interest in the Johnston principal position and her response that she would consider it but Plaintiff was a "real problem." (Pl.'s Ex. 2, Jolin Dep. (Vol. I) at 32.) Both in their Memorandum of Law (p. 6) and at the hearing, Defendants argued that the "failure to investigate" allegation made against Plaintiff (and referred to Attorney Flaherty for investigation) was a "mere claim of incompetence" and was not sufficiently stigmatizing to support a liberty interest claim. If that is so, then a reasonable factfinder could conclude that the allegation did not warrant placing Plaintiff on administrative leave. However, Dr. Jolin testified that Plaintiff was "kept out of the building..., as of even May 1, 2000," because Attorney "Flaherty's investigation [of the failure to investigate allegation] hadn't been completed yet." (Pl.'s Ex. 6, Jolin Dep. (Vol II) at 62.)

The final two Wojcik elements require that the stigmatizing statements be made in conjunction with an alteration of the employee's legal status and the employee be denied a name-clearing hearing. Again, this Court cannot say, as a matter of law, that a reasonable jury could not find for Plaintiff on these elements. All of the evidence discussed regarding the first three Wojcik elements occurred in conjunction with Plaintiff's nonrenewal and related proceedings. Plaintiff was never given a name-clearing hearing regarding the allegations that led to his administrative leave. There are factual disputes as to when and if the investigation(s) of such allegations were ever completed. In any event, it is undisputed that Plaintiff's administrative leave was never concluded and that neither Dr. Jolin nor the School Committee ever made any final determination regarding those allegations. When the end of the school year approached, they simply turned their attention to the nonrenewal issue and viewed the administrative leave issue as moot. While it may have been moot to them, it was not moot to Plaintiff who was reentering the job market in search of a position for the next academic year. It should also have been obvious to Defendants due to their familiarity with the hiring process that Plaintiff's conspicuous and later publicized administrative leave would likely come up in Plaintiff's job search. Plaintiff has offered evidence that at least one potential employer viewed it as a "cloud" and ultimately rejected Plaintiff's application.

Significantly, one of the Defendants, School Committee Member David Santilli, testified that he questioned Dr. Jolin before the end of the 1999-2000 school year about why Plaintiff was not being "brought back in" to work. (Pl.'s Ex. 1, Santilli Dep. at 31-32.) Mr. Santilli indicated that Dr. Jolin told him that the "investigation was concluded" and that Mr. Santilli understood "it was found to be not true." (Id. at 32.) Mr. Santilli testified that he objected to Plaintiff remaining on

administrative leave and told Dr. Jolin "to bring him back in." (Id. at 38.) Mr. Santilli indicated that he walked into a conversation between Dr. Jolin and School Committee Chairperson Robin Carlone regarding this issue. (Id. at 33.) Neither Dr. Jolin nor Ms. Carlone disputed that this conversation may have taken place. (Pl.'s Ex. 6, Jolin Dep. (Vol. II) at 63). Thus, a reasonable jury could conclude that, even though the investigation was done, they decided to leave Plaintiff on administrative leave until the end of the school year because of the nonrenewal decision.

Although Plaintiff may ultimately fail on his liberty interest claim, Defendants have simply not met their burden under Fed. R. Civ. P. 56(c) of establishing the absence of all genuine issues of material fact for trial on this claim. For similar reasons, Defendants have not established entitlement to summary judgment as to Plaintiff's state law defamation claim.

As to the qualified immunity defense, Defendants have also not established an entitlement to summary judgment. In analyzing qualified immunity, the Court is required to follow a three-step sequence. Savard, 338 F.3d at 27. First, the Court asks whether, "[t]aken in the light most favorable to [Plaintiff], do the facts alleged show the [Defendants'] conduct violated a constitutional right?" Saucier, 533 U.S. at 201. Second, if so, the Court must determine if the right allegedly violated (in this case, procedural due process) was "clearly established" at the time. Brosseau, 543 U.S. 194. Finally, if the right was clearly established, the court examines "whether a reasonable official, situated similarly to the defendant[s], would have understood that the conduct at issue contravened the clearly established law." Savard, 338 F.3d at 27, citing Saucier, 533 U.S. at 202.

Applying the three-step test for qualified immunity to this case, the facts presented demonstrate that there are genuine issues of material fact as to this constitutional claim. Moreover,

the claim has clearly established roots in multiple Federal Court decisions including those of the Supreme Court. Further, Defendants have not established, as a matter of law, that a reasonable official, similarly situated, would not have understood that the conduct at issue violated a clearly established right. In fact, as noted above, one of the School Committee Defendants, David Santilli, testified that he questioned Dr. Jolin about Plaintiff's status and when he would be "brought back in" to work. (Pl.'s Ex. 1, Santilli Dep. at 31-32.) Mr. Santilli testified that he advised Dr. Jolin, "if the investigation is finished, then bring [Plaintiff] back," and that he "showed [his] objection" to leaving Plaintiff on administrative leave and felt doing so was not fair. (Id. at 37-38.)

Defendants' reliance on Townsend v. Vallas, 256 F.3d 661, 675 (7th Cir. 2001), is misplaced. Although the case involved a lengthy paid administrative leave and the defendants were granted qualified immunity, the facts are distinguishable from this case. In Townsend, the plaintiff, a tenured physical education teacher, was temporarily transferred to a nonteaching position pending investigation of a student drowning in a physical education swimming class. The teacher was not disciplined, and he was ultimately reinstated to a teaching position. The teacher unsuccessfully pursued a property interest claim but did not pursue a liberty interest claim, presumably because he never permanently lost his job. Further, there was no evidence in that case of any ulterior motive for reassigning the plaintiff, such as a "personal vendetta" against him. Townsend, 256 F.3d at 678.

Defendants simply have not established entitlement to summary judgment as to Plaintiff's liberty interest claim or their qualified immunity defense to such claim. Thus, this Court recommends that Defendants' Motion for Summary Judgment be DENIED as to that claim and defense. Furthermore, as discussed above, this Court recommends that Defendants' Motion for

Summary Judgment be DENIED as to Plaintiff's state law defamation claim and Defendants' qualified privilege defense.

**II. Substantive Due Process**

In addition to his procedural due process claims, Plaintiff argues that Defendants' actions were so "conscience shocking" as to also violate his substantive due process rights. Plaintiff cites only two cases in support of his substantive due process claim. See Montgomery v. Stefaniak, 410 F.3d 933, 939 (7th Cir. 2005) (claim of wrongful termination of public employment was not conscience shocking and thus did not state a substantive due process claim); and Weiler v. Purkett, 137 F.3d 1047, 1051 (8th Cir. 1998) (refusal to deliver package to a prison inmate did not shock the conscience). Neither case is a First Circuit opinion, and neither supports Plaintiff's argument.

In discussing the "conscience shocking" standard invoked by Plaintiff, the First Circuit recently instructed that "Courts regularly have required something more egregious and more extreme" than "[m]ere violations of state law, even violations resulting from bad faith." DePoutot, 424 F.3d at 119. "The requisite arbitrariness and caprice must be stunning, evidencing more than humdrum legal error." Amsden v. Moran, 904 F.2d 748, 754 at n.5 (1st Cir. 1990). Further, "[s]ubstantive due process claims generally have something to do with 'matters relating to marriage, family, procreation, and the right to bodily integrity' rather than property or employment issues." Learnard v. Inhabitants of Van Buren, 164 F. Supp. 2d 35, 41 at n.2 (D. Me. 2001), quoting Albright v. Oliver, 510 U.S. 266, 272 (1994). See also Souza v. Pina, 53 F.3d 423, 427 (1st Cir. 1995) (involving "extreme or intrusive physical conduct"); and Harrington v. Almy, 977 F.2d 37, 43-44

(1st Cir. 1992) (involving police officer dismissed for child abuse who was required to undergo a penile plethysmograph as a condition of reinstatement).

Viewing all the evidence in a light favorable to Plaintiff and drawing all reasonable inferences in his favor, this Court concludes that a reasonable factfinder would not consider Defendants' alleged actions to be "conscience shocking" particularly because they do not involve any "highly intrusive physical conduct." Harrington, 977 F.2d at 43. While a reasonable factfinder could find that Defendants' actions harmed Plaintiff's professional reputation and search for employment, such alleged harm is simply insufficient to rise to the level of a substantive due process violation.

Thus, this Court recommends that Defendants' Motion for Summary Judgment be GRANTED as to Plaintiff's substantive due process claim. For similar reasons, this Court also recommends that Defendants' Motion for Summary Judgment be GRANTED as to Plaintiff's state law intentional infliction of emotional distress claim, as such a claim similarly requires a showing of "extreme and outrageous" conduct. See Swerdlick v. Koch, 721 A.2d 849, 862-63 (R.I. 1998).

### III. Breach of Employment Agreement

Plaintiff alleges that Defendants' "wrongful actions" also constituted a breach, in several respects, of his Agreement to serve as Assistant Principal for the 1999-2000 academic year. (See Compl., Count IV.) As noted above with respect to Plaintiff's procedural due process claim, the Agreement did not vest Plaintiff with any expectation of renewal or extension beyond June 30, 2000. In addition, the Agreement did not prevent Defendants from placing Plaintiff on a fully paid

administrative leave. Thus, to the extent Plaintiff's breach of contract claim relates to the administrative leave or nonrenewal, it fails as a matter of law.

The only claimed breach addressed in any detail by either party concerns Defendants' failure to provide Plaintiff with a performance evaluation. The Agreement provides in Section XIII (EVALUATION) that:

> The Superintendent shall evaluate the performance of the Administrator annually based minimally on the following standards of evaluation: a) relevant language contained in this contract; b) the policies and directives of the Committee; c) the policies and directives of the Superintendent; d) the job description for the position assigned; e) the annual school and individual improvement goals; and f) professional growth. Documented weak performance, an inadequate professional growth plan and/or follow-through, and/or poor fiscal management are some causes for the Superintendent to mandate a plan designed to lead to satisfactory performance. Failure to achieve the goals of such a plan within a reasonable amount of time may lead to consequences such as non-renewal of this Contract or action to terminate the contract prior to its expiration. The only occasion in which the Superintendent will designate an evaluation of an Administrator to be completed by another Administrator would be in a case of an Assistant Principal being review [sic] by the Principal. Generally these evaluations shall be completed between May and August.

* * *

The Court must "give[ ] the [unambiguous] language in the [Agreement] its 'plain, ordinary and usual meaning.'" Hord Corp. v. Polymer Research Corp., 275 F. Supp. 2d 229, 235 (D.R.I. 2003), quoting Amica Mut. Ins. Co. v. Streicker, 583 A.2d 550, 552 (R.I. 1990). "A contract is ambiguous...[only] if it is 'reasonably susceptible of different constructions.'" Id., quoting Vickers Antone v. Vickers, 610 A.2d 120, 123 (R.I. 1992).

In this case, although the parties tender differing interpretations of the Agreement, neither argues that it is ambiguous, and it is not. Defendants do not dispute that a formal evaluation of Plaintiff's performance was not completed under Section XIII of the Agreement. Rather, Defendants contend that they were excused from performance as it relates to the evaluation for two reasons.

First, Defendants note that Section III of the Agreement required Plaintiff to complete an annual self-evaluation, and argue that the completion of the self-evaluation was a condition precedent to Defendants' obligation to evaluate Plaintiff. Defendants' argument is not convincing. "A condition precedent is an act which must occur before performance by the other party is due." Hope Furnace Assocs., Inc. v. FDIC, 71 F.3d 39, 43 (1st Cir. 1995) (quoting Massachusetts law). Section III does not indicate when during the year the self-evaluation must be completed.[5] Further, Section XIII itself does not identify the self-evaluation as an express condition precedent. See Rotelli v. Catanzaro, 686 A.2d 91, 94-95 (R.I. 1996) (use of the word "after" in a contract "typically indicates" the existence of a condition precedent).

Section XIII does not refer to Section III or the term "self-evaluation." While Section XIII indicates that the evaluation will be "based," in part, on "individual improvement goals" and "professional growth," it does not say that the completion of a self-evaluation by the Administrator under Section III is the only manner by which the Superintendent could evaluate those factors. Finally, Section XIII provides that the performance evaluations "shall be completed between May and August" while Section VII requires submission of the self-evaluation "at the close of each school

---

[5] Section VII (PROFESSIONAL GROWTH) indicates that the self-evaluation must be submitted to the Superintendent "at the close of each school year" but also does not provide that the self-evaluation is a precondition to a Section XIII evaluation.

year." If the self-evaluation was an express condition precedent, the Agreement would not have been drafted to allow the evaluation (between May and August) to potentially precede the self-evaluation (close of school year).

Second, Defendants argue that Plaintiff's evaluation could not be completed "between May and August" because he was placed on administrative leave in April. In fact, at the June 20, 2000 School Committee meeting regarding Dr. Jolin's nonrenewal recommendation, Plaintiff's attorney questioned why Plaintiff was never evaluated as required. In response, Dr. Jolin stated that "[i]t was not possible to complete a full evaluation while [Plaintiff] was on...leave." (Pl.'s Ex. 8, Minutes of June 20, 2000 meeting at 7.) Defendants offer no explanation as to why it would have been impossible to evaluate Plaintiff while he was on administrative leave. Just as Defendants ordered Plaintiff to not report to work and to stay off school grounds, Defendants could have directed Plaintiff to meet with Dr. Jolin or Ms. Pitocchi to conduct his performance evaluation. Although Plaintiff was on leave for the final two to three months of the school year, he worked as Assistant Principal from September to April and could have been evaluated on his performance during that period. Defendants cannot rely on their own decision to place Plaintiff on administrative leave as a basis for nonperformance. See Bradford Dyeing Ass'n, Inc. v. J. Stog Tech GmbH, 765 A.2d 1226, 1237-38 (R.I. 2001) (if one party to a contract prevents the performance of a condition precedent by the other party, the action eliminates the condition precedent).

Finally, the nonrenewal decision did not moot any reason to evaluate Plaintiff's performance. The decision to not renew Plaintiff's Agreement was based, in part, on Dr. Jolin's conclusion that Plaintiff "performed in a manner that he believed could be improved upon." (Pl.'s Ex. 8, Minutes

of June 20, 2000 meeting at 2.) The failure to provide an evaluation to Plaintiff deprived him of advance notice of these claimed performance deficiencies and potentially disadvantaged him in the nonrenewal process. The Agreement did not provide that the evaluations would only be conducted in the event of renewal and, for reasons of professional development, an evaluation would be of value even to a nonrenewed administrator.

For the reasons discussed above, Defendants have not established their entitlement to summary judgment on Plaintiff's breach of contract claim. Thus, this Court recommends that Defendant's Motion for Summary Judgment be DENIED as to that claim, except to the extent Plaintiff is claiming breach as it directly relates to his administrative leave or nonrenewal.

## IV. Tortious Interference with Contractual Relations

In his Complaint, Plaintiff alleges that, "as a direct result of Defendants' action, Defendant Johnston School Committee violated, repudiated and broke the contract with Plaintiff...and refused to continue therewith on and after April 11, 2000." (Compl. ¶ 65.) Plaintiff also asserts that Defendants "wrongfully, intentionally, and maliciously induced and persuaded Defendant Johnston School Committee to breach its contract with Plaintiff...and refuse to continue therewith during the 1999-2000 school year." (Id. ¶ 64.)

Under Rhode Island law, a party must prove the following elements to prevail on a tortious interference with contract claim:

(1) the existence of a contract;

(2) knowledge of the contract by the alleged interferor;

(3) an intentional act of interference;

(4) causation; and

(5) damages.

Mesolella v. City of Providence, 508 A.2d 661, 669 (R.I. 1986). There is a fundamental flaw in Plaintiff's theory on this claim. It is undisputed that the contract in question is the Employment Agreement between the Johnston School Committee and Plaintiff. Relying on Jolicoeur Furniture Co. v. Baldelli, 653 A.2d 740, 752 (R.I. 1995), Defendants argue that the Defendant School Committee and its members are party to the Agreement and, as a matter of law, cannot interfere with their own Agreement. Plaintiff disputes this legal conclusion and contends that "the record is rife with evidence that [Dr.] Jolin intentionally interfered with Plaintiff's Contract." (Pl.'s Mem. at 19.) Plaintiff does not assert or point to any evidence that any of the other Defendants (the School Committee, its members or Ms. Pitocchi) intentionally interfered with the Agreement. Thus, Defendants are entitled to summary judgment at least as to those Defendants on the tortious interference claim.

The only issue remaining to decide, then, is whether Dr. Jolin and the School Committee can be considered the same party which would preclude a tortious interference claim against Dr. Jolin related to the Agreement. Under Johnston's Home Rule Charter, the School Committee is vested with the power to "determine and control all policies affecting the administration, maintenance and operation of the public schools" and to "appoint...a superintendent of schools as its chief administrative agent who shall have, under the direction of the school committee, the care and supervision of the public schools." Johnston Home Rule Charter, §§ 15-5(2) and (3).

In Jolicoeur, the contract at issue was between the City of Woonsocket and a landowner. Woonsocket's Home Rule Charter created two branches of government – legislative vested in the City Council and executive vested in the Mayor. Because it was "not inconceivable that the[se] separate branches would be independent enough to act in opposition to one another...," 653 A.2d at 752, the Rhode Island Supreme Court held that the City's Mayor and Planning Director, as members of the executive branch, could not be considered the same party as the City and thus could be liable for tortious interference with a City contract.

This case is distinguishable from Jolicoeur in several respects. First, the contract in issue was not between the Town and Plaintiff but rather was between Plaintiff and a single arm of Town government – the School Committee. As School Superintendent, Dr. Jolin was not employed in an arm of Town government, separate from the School Committee, or in a position independent of the School Committee. Dr. Jolin was the School Committee's "chief administrative agent," and he acted "under the direction of the School Committee." Johnston Home Rule Charter, § 15-5(3). As the School Committee's agent, Dr. Jolin is considered to be the same party as the School Committee for these purposes. Thus, for the reasons stated above, this Court recommends that Defendants' Motion for Summary Judgment be GRANTED as to Plaintiff's tortious interference claim.

**V. Negligence / Loss of Consortium**

As to Plaintiff's negligence count, Defendants offer two sentences in support of their Motion for Summary Judgment. The first sentence incorrectly summarizes the substance of Plaintiff's negligence claim. The second sentence claims, without any supporting analysis, that such claim is essentially a breach of contract claim and refers the Court to the arguments made by Defendants with respect to the contract claim.

"[I]t is not for this Court to search the legal haystacks for a needle of authority." Young v. City of Providence, 396 F. Supp. 2d 125, 133 (D.R.I. 2005). Defendants "cannot ignore [their] burden of developed pleading" and the two sentences provided to the Court do not meet that burden. See United States v. Slade, 980 F.2d 27, 31 (1st Cir. 1992). Further, Defendants rely upon the arguments made in connection with Plaintiff's breach of contract claim. However, those arguments were not completely successful. For these reasons, this Court recommends that Defendants' Motion be DENIED as to Plaintiff's negligence claim.

Finally, as to Plaintiffs' loss of consortium claim, Defendants address that claim in a footnote and argue that the entry of summary judgment on Plaintiff's tort claims also mandates summary judgment on Plaintiffs' loss of consortium claim. See Illas v. Przybyla, 850 A.2d 937, 943 (R.I. 2004) (a loss of consortium claim by plaintiff's family members is derivative of liability on the plaintiff's underlying tort claim). Since this Court recommends denial of summary judgment as to some of Plaintiff's tort claims, it also recommends that Defendants' Motion for Summary Judgment be DENIED as to Plaintiffs' loss of consortium claim.

**Conclusion**

For the reasons stated, this Court recommends that the District Court GRANT Defendants' Motion for Summary Judgment (Document No. 45) in part as to Count I (Procedural Due Process – Property Interest Claim); Count II (Substantive Due Process); Count V (Tortious Interference with Contract); and Count VI (Intentional Infliction of Emotional Distress); and otherwise DENY the Motion as to all other claims in Plaintiffs' Complaint, i.e., Count I (Procedural Due Process – Liberty Interest Claim); Count IV (Breach of Employment Agreement); Count VI (Loss of Consortium);

Count VIII (Negligence); Count IX (Defamation); and Count XIII (Punitive Damages).[6] Any objection to this Report and Recommendation must be specific and must be filed with the Clerk of the Court within ten (10) days of its receipt. Fed. R. Civ. P. 72(b); Local Rule 32. Failure to file specific objections in a timely manner constitutes a waiver of the right to review by the District Court and the right to appeal the District Court's decision. United States v. Valencia-Copete, 792 F.2d 4 (1st Cir. 1990).

LINCOLN D. ALMOND
United States Magistrate Judge
December 27, 2005

[6] In his Complaint, Plaintiff has misnumbered his Counts so that there are some duplicate numbers and some missing numbers. There is no Count III, VII, X, XI or XII and there are two Count VIs.