UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| Stephen F. Chrabaszcz, Jr., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>Johnston School Committee, et al.,<br><br>Defendants. | ) | C.A. No. 03-133S |

**ORDER CLARIFYING AND AMENDING PUBLISHED OPINION**

WILLIAM E. SMITH, United States District Judge.

Pursuant to Defendant Michael Jolin's unopposed Motion for Clarification, the court orders the following:

On page 2, third line down, add "grant defendant Dr. Jolin's motion on the breach of contract verdict but" after "the court will" and substitute "the rest" for "all" so the sentence reads "further, the court will grant defendant Dr. Jolin's motion on the breach of contract verdict but deny the rest of defendants' motions."

On page 49, fourth line from the bottom, add "except with respect to Dr. Jolin's motion on the breach of contract verdict which is GRANTED" after "DENIED" so the sentence reads "Based upon the foregoing, Defendants' Renewed Motion for Judgment as a Matter of Law, Motion for a New Trial, or in the alternative for a Remittitur is hereby DENIED except with respect to Dr. Jolin's motion on the breach of contract verdict which is GRANTED."

BY ORDER:

Karen Baldwell

Deputy Clerk

ENTER:

WESmith

William E. Smith
United States District Judge
Date: 2/13/07

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| Stephen F. Chrabaszcz, Jr., et al., Plaintiffs, | ) | |
| v. | ) | C.A. No. 03-133S |
| Johnston School Committee, et al., Defendants. | ) | |

**DECISION AND ORDER**

WILLIAM E. SMITH, United States District Judge.

On May 22, 2006, a jury returned a verdict for plaintiffs on claims for breach of contract, defamation and loss of consortium against defendants, the Town of Johnston, its then school committee and its then Superintendent Dr. Michael Jolin.[1] This matter is now before the Court on four post-trial motions: (1) defendants' Renewed Motion for Judgment after Trial, Motion for a New Trial, or in the alternative, for a Remittitur ("Renewed Motion"); (2) plaintiffs' Motion seeking Modification/Clarification of Judgment; (3) plaintiffs' Motion seeking an Award of Attorneys' Fees; and (4) defendants' Motion for Attorney's Fees. Argument was heard on July 12, 2006. For the reasons set forth below, the Court will grant

[1] Plaintiffs also brought a liberty interest claim, but abandoned it after the close of their case in chief.

plaintiffs' motion for clarification of the judgment in part (to add prejudgment interest) but will deny its motion for additional attorney's fees; further, the court will grant defendant Dr. Jolin's motion on the breach of contract verdict but deny the rest of defendants' motions.

I. Defendants' Renewed Motion for Judgment after Trial and Motion for a New Trial, or in the Alternative, for a Remittitur.

At the close of plaintiffs' case at trial, and then again after the close of all evidence, defendants moved for a judgment as a matter of law (JMOL), under Federal Rule of Civil Procedure 50(a), on the claims for breach of contract, defamation, and loss of consortium. This court denied that motion and, after the jury found in favor of plaintiffs, defendants renewed their motion for JMOL, pursuant to Rule 50(b). Additionally, defendants sought, in the alternative, a new trial under Rule 59(a) or remittitur, see generally 11 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure, § 2815 at p. 169 (2d ed. 1995) [hereinafter "Federal Practice and Procedure"].

Plaintiffs argue that defendants have waived most of the claims contained in their Rule 50(b) motion because they failed to specifically raise them in their Rule 50(a) motion. Barring success on this threshold argument, plaintiffs also contend that the evidence is sufficient to support a jury finding in their favor

under any of the defendants' alternative theories for relief.[2] The court addresses these arguments in turn.

A. Waiver

Plaintiffs contend that although defendants in their Rule 50(a) motion argued that the evidence was insufficient with respect to the breach of contract, defamation, and loss of consortium claims, they did so on different grounds than were advanced in their Rule 50(b) motion. Specifically, plaintiffs allege that defendants' Rule 50(a) motion failed to assert that: (1) Dr. Jolin was not a signatory to the contract and therefore could not be found to have breached the contract; (2) the indemnification provision in the contract was not intended to include plaintiffs' claims, and therefore could not have been breached; (3) the plaintiff failed to prove consequential damages; (4) Dr. Jolin holds an absolute privilege with respect to any defamatory remarks he made toward Chrabaszcz; and (5) there was no evidence to support a finding of a causal link between Dr. Jolin's statements and monetary damages. Because these arguments now appear in defendants' Rule 50(b) motion, plaintiffs argue that insofar as they constitute distinct and previously unasserted grounds for

---

[2] The threshold question of waiver affects only defendants' renewed motion for judgment as a matter of law; waiver is not implicated in a Rule 59 motion for a new trial. Oliveras v. American Export Isbrandtsen Lines, Inc., 431 F.2d 814, 817 (2d Cir. 1970). Likewise, failure to assert a claim in a pre-verdict motion for judgment will not later bar a motion for remittitur.

dismissal and were not included in the earlier motion, as a matter of law they must be considered waived.

In order to avoid waiver of issues or claims raised in a Rule 50(b) motion, a moving party must first have made a proper and sufficient motion for JMOL pursuant to Rule 50(a). See Rankin v. Evans, 133 F.3d 1425, 1431 (11th Cir. 1998); Perdoni Bros., Inc. v. Concrete Sys., Inc., 35 F.3d 1, 3 (1st Cir. 1994). A motion made pursuant to Rule 50(a) "shall specify . . . the law and the facts on which the moving party is entitled to judgment." Fed. R. Civ. P. 50(a)(2). In other words, a motion for JMOL must state the specific grounds upon which the moving party believes the evidence is insufficient to support a jury's finding; it cannot consist merely of "[s]weeping invocations of conclusory theories or abstract principles." Perdoni Bros. 35 F.3d at 3; see Williams v. Runyon, 130 F.3d 568, 572 (3d Cir. 1997) (noting that the "blanket statement that 'there is no legally sufficient evidentiary basis for a reasonable jury to find for the Plaintiff or any of the issues that counsel have set forth in this case' is obviously insufficient."); see also Zimmerman v. Direct Federal Credit Union, 262 F.3d 70, 75 (1st Cir. 2001); Anderson v. United Tel. Co. of Kansas, 933 F.2d 1500, 1504 (10th Cir. 1991). A renewed motion for JMOL is thus "nothing more than a renewal of the earlier motion made at the close of the presentation of the evidence, it cannot assert a ground that was not included in the earlier motion." 9A

Federal Practice and Procedure § 2537 at p. 344-45. Accordingly, it is well-settled that "[t]he movant cannot use [Rule 50(b)] as a vehicle to introduce a legal theory not distinctly articulated in its close-of-evidence motion for a directed verdict." Correa v. Hosp. San Francisco, 69 F.3d 1184, 1196 (1st Cir. 1995).

Nevertheless, despite Rule 50(a)'s demand that a moving party assert the "specific grounds" for its directed verdict motion, see Anderson, 933 F.2d at 1504, there is no clearly articulated standard for what constitutes "specific grounds." The reluctance to solidify such a standard derives in part from a recognition that the Rule 50(b) waiver is "harsh in any circumstance," and, if applied unyieldingly, could frustrate "the purpose of the rules to secure a just, speedy, and inexpensive determination of a case." Id., at 1503. For purposes of determining whether claims in a Rule 50(b) motion have been waived, i.e., whether the "specific grounds" for those claims were not presented in the Rule 50(a) motion, courts thus often look to "whether the purposes the rule embodies have been served." Id. at 1504. In this regard, "[a] party is obliged to make a motion for [JMOL] at the close of the evidence as a prerequisite to a [Rule 50(b)] motion . . . to ensure that neither the court nor the opposing party is lulled into complacency concerning the sufficiency of the evidence." Rankin, 133 F.3d at 1432 (internal quotations and citations omitted); see also Scottish Heritable Trust v. Peat Marwick Main & Co., 81 F.3d 606, 610 (5th

Cir. 1996) ("the two basic purposes of [Rule 50(b)] are to enable the trial court to re-examine the question of evidentiary insufficiency as a matter of law if the jury returns a verdict contrary to the movant, and to alert the opposing party to the insufficiency before the case is submitted to the jury") (internal quotation marks and citation omitted); Perdoni, 35 F.3d at 3 ("The motion must . . . be made with sufficient specificity to allow the district court to understand precisely why the evidence is insufficient.") (quoting Wells Real Estate, Inc. v. Greater Lowell Bd. of Realtors, 850 F.2d 803, 810 (1st Cir. 1988)). Consequently, the strictness with which Rule 50 is applied depends on whether the opposing party and the court have been effectively put "on notice" concerning the sufficiency of the evidence for proving specific claims.

For instance, a Rule 50(a) motion raising the issue of sufficiency of evidence for liability, damages, and future lost profits is sufficient to allow a Rule 50(b) motion on the issue of goodwill and reputation because, although the latter issues "may be legally distinct, the two are also closely related, for insofar as lost goodwill and reputation are compensable they are conceivable as a lost stream of future income." See Nat'l Indus., Inc. v. Sharon Steel Corp., 781 F.2d 1545, 1549 (11th Cir. 1986). Similarly, a rule 50(a) motion that asserts that a duty of care claim could not be established by a "mere breach of contract" is

sufficient to preserve a Rule 50(b) motion that seeks to assert an alternative basis for the insufficiency of evidence to establish a duty of care, namely that "there can be no tort liability . . . where the plaintiff is seeking recovery solely for economic losses." Kusens v. Pascal Co., Inc., 448 F.3d 349, 362 (6th Cir. 2006) (discussing Rockport Pharmacy, Inc. v Digital Simplistics, Inc., 53 F.3d 195, 197 (8th Cir. 1995)). The issue was found not waived because the two grounds, although somewhat distinct were considered "inextricably intertwined," because "in any negligence action, the plaintiff must first establish that a duty exists by the defendant to protect the plaintiff from the injury suffered . . . . [Thus,] in determining whether a breach of contract may give rise to tort liability, the nature of the alleged injury [i.e., whether the claim is based solely on economic losses] is an essential factor that must be considered." Rockport Pharmacy, 53 F.3d at 198 (internal quotation marks and citation omitted). Finally, even a generalized pre-verdict motion made orally may support a more specific Rule 50(b) motion that attacks a specific element of the claim. For example, in Kusens, the defendant offered only a pre-verdict "general argument made orally that Plaintiff failed to argue his public policy claim, at all." 448 F.3d at 362. After the jury returned a verdict in favor of plaintiffs, "[t]he post-verdict motion, which was made in writing

and was fully briefed, presented the failure to establish a public policy claim with specificity," and was permissible. Id.

Given this terrain, the court must assess whether the objections made by defendants orally at the close of plaintiffs case were sufficient to preclude waiver of defendants' post-verdict Rule 50(b) objections.

Comparing defendants' post-verdict claim -- that Dr. Jolin was not a signatory to the contract and therefore could not be found to have been in breach -- with their pre-verdict arguments, this court concludes that the plaintiffs were sufficiently on notice that defendants were challenging the sufficiency of the evidence on the issue of who was a party to the contract. Therefore, the defendants' post-verdict claim is not waived. After the close of evidence, defendants argued that the only signatories to the contract were the School Committee and Chrabaszcz, and that the evidence was insufficient to establish breach by anyone other than these two parties. The fact, while true, that the defendants failed to specifically argue that Dr. Jolin was not a signatory is not sufficient to establish waiver of this argument because plaintiffs and the court were placed on notice that defendants believed only the parties to the contract could be liable for breach. Implicit in this argument is that the evidence was not sufficient to prove a specific claim that other parties, beyond the School Committee and Chrabaszcz, were liable for breach.

Moving to defendants' post-verdict claim that the indemnification provision in the contract was not intended to include plaintiffs' claims, the court finds this argument has been waived. In its pre-verdict motion, the only arguments the School Committee offered for why it could not have breached the contract was that it was an improper party in the suit and, alternatively, that it did not breach the contract because it did not defame the plaintiff. Neither of these theories addresses in any relevant way the plaintiffs' claim that the School Committee breached the contract by declining to indemnify or reimburse plaintiff for damages associated with claims or actions related to plaintiff's firing. Because it neglected to pursue any objection directed to this theory of the case in their Rule 50(a) motion, the School Committee cannot now seek its vindication.[3]

Plaintiffs next assert that defendants waived their Rule 50(b) claim to the insufficiency of evidence to prove consequential damages flowing from the breach of contract. Here, however, contrary to plaintiffs' claim of waiver, defendants did challenge the sufficiency of evidence to support damages flowing from the breach of contract. Specifically, at the hearing on the pre-verdict motion for JMOL, defendants argued that they did not "see

[3] Additional support for this conclusion comes from the fact that defendants declined the opportunity to offer a jury instruction explaining the limitation of the indemnity clause. Conseco Finance Servicing Corp. v. North American Mortgage Co., 381 F.3d 811, 822 n.7 (8th Cir. 2004).

any damages involved [as flowing from the purported breach of contract] because there was no evidence that concerned any of that." Although very general, the court finds that plaintiffs were put on notice that a claim as to the insufficiency of evidence with respect to damages was being asserted; it is therefore not waived for purposes of defendants' Rule 50(b) motion. Additionally, an element of a breach of contract claim is proof of damages. Thus, because an objection to the sufficiency of proof of consequential damages flowing from the breach is "an essential factor [of the former claim] that must be considered," Rockport Pharmacy, 53 F.3d at 198, defendants' challenge to the sufficiency of the breach claim put plaintiff on notice of the inadequacy of proof of the damages claim and was adequately preserved.

Penultimately, plaintiffs contend that defendants' post-verdict claim that Dr. Jolin held an absolute privilege with respect to any defamatory remarks he may have made toward Chrabaszcz should be considered waived. During the pre-verdict Rule 50(a) motion hearing, defendants argued that Chrabaszcz's defamation claim failed as a matter of law because Dr. Jolin was entitled to a qualified privilege for his statements because he made them in good faith.[4] Plaintiff is right that throughout trial

[4] The elements of a defamation claim include: (1) a false and defamatory statement concerning another; (2) an unprivileged publication to a third party; (3) fault amounting at least to negligence on the part of the publisher; and (4) damages unless the statement is actionable irrespective of special harm. Healey v.

and at the pre-verdict hearing, defendants consistently asserted their position that Dr. Jolin was entitled to a qualified privilege for his statements and that, therefore, they could not be found to have been defamatory. Nowhere in their Rule 50(a) motion did defendants advance the argument that, in fact, Dr. Jolin was entitled to absolute privilege. Plaintiff is also correct that the claim of absolute privilege is a distinct and separate legal theory on which an affirmative defense to a claim of defamation may be premised. See Boston Mut. Life Ins. Co. v. Varone, 303 F.2d 155, 158 (1st Cir. 1962). So the question is whether the initial pre-verdict objection to the defamation claim, which employed the legal theory of qualified privilege should entitle the defendant to a post-verdict objection to the same claim on the alternative and distinct ground of absolute privilege.

In Whelan v. Abell, 48 F.3d 1247 (D.C. Cir. 1995), the Court of Appeals for the District of Columbia was presented with a claim that the defendants failed to raise an affirmative defense in their pre-verdict motion, thereby waiving it for purposes of their Rule 50(b) motion. Specifically, defendants' pre-verdict motion argued that plaintiffs' failure to prove "an unprivileged, improper, intentional interference with [a business] expectancy," must result in the dismissal of their claims. Id. at 1251. Their post-verdict motion, however, included the argument that the Noerr-Peninnington

New England Newspapers, Inc., 555 A.2d 321, 324 (R.I. 1989).

doctrine[5] barred each of plaintiffs' claims. After first noting that "[t]he only reference [in the pre-verdict motion] that could conceivably allude to the Noerr-Pennington doctrine is the word 'unprivileged,'" the court rejected defendants' contention that this reference "somehow echoed their arguments in the trial that Noerr-Pennington created some form of evidentiary privilege." Id. Recognizing that, "of course context is important," the court nonetheless concluded that the "trial court[] and opposing counsel cannot be expected to impute to the movants every meaning that might be grounded on such a remote foreshadowing." Id. Because "Rule 50(b) limits a post-verdict motion . . . to a 'renewal' of the pre-verdict motion," the court held that the Noerr-Pennington claim was too remote and independent a claim to be fairly said to have reasonably put the parties and the court on notice in the pre-verdict motion. Id.

This court finds the reasoning in Whelan persuasive. As noted, defendants failed to assert the defense of absolute privilege in their answer, at trial or in their pre-verdict motion for a directed verdict. See Lynch v. City of Boston, 180 F.3d 1, 13 n.9 (1st Cir. 1999). Instead, throughout the pendency of the trial, the only privilege defense they advanced was that of

---

[5] This doctrine offers protection from antitrust liability for certain individuals who petition government officials in an "effort to restrain or monopolize trade." Allied Tube & Conduit Corp. v. Indian Head, Inc., 486 U.S. 492, 499 (1988).

qualified privilege. To allow defendants now successfully to assert an entirely new legal theory for why the defamation claim is insufficient would stretch whatever flexibility Rule 50(b) might have past its breaking point. Indeed, to the extent that, as the court in Whelan noted, Rule 50(b) is a "renewal" of the pre-verdict motion, it cannot be used "as a vehicle to introduce a legal theory not distinctly articulated in its close-of-evidence motion for a directed verdict." Correa, 69 F.3d at 1196.

It might be argued that this pre-verdict/post-verdict distinction is no different than that asserted in Kusens, where the court determined that a "general argument made orally that [p]laintiff failed to argue his public policy claim, at all," sufficiently put plaintiffs on notice for the more specific claim, made post-verdict, that the public policy claim was deficient because plaintiffs had failed to prove the at-will employment element. 448 F.3d at 362.

But defendants' new claim here is distinguishable in an important respect: in Kusens, the renewed claim asserted a more specific evidentiary ground for why the claim was deficient; that is, plaintiffs were put on notice as to the evidentiary insufficiency of their claim, and thus the renewed claim merely "fleshed out" which elements were insufficient from an evidentiary standpoint. Here, the defendants' renewed claim asserted not a consistent but more specific argument for why the defamation claim

must fail from an evidentiary standpoint (i.e., which element plaintiffs failed to prove); rather, it asserted an entirely new legal theory about why the claim should fail.

In essence, the touchstone of the inquiry into whether a post-verdict claim may survive the Rule 50(b) command of waiver is whether the newly asserted claim is connected to - or inextricably intertwined with - the previously asserted ground. See Rockport, 53 F.3d at 198 ("Although the economic loss ground advanced in Digital's post-trial motion may have been somewhat different from the duty-of-care ground advanced in the pre-verdict motion, we conclude that those grounds were inextricably intertwined."); Aguinaga v. United Food & Commercial Workers Int'l Union, 993 F.2d 1463, 1470 (10th Cir. 1993) (finding that a post-verdict claim was not waived because it was inextricably intertwined with the pre-verdict claim). Where, as here, the "renewed" motion presents an entirely distinct legal theory for dismissal, not fairly alluded to in the pre-verdict motion and unrelated to the initial argument (beyond merely asserting that it, too, defeats plaintiffs' claim), it cannot be allowed under Rule 50(b). Here, the absolute privilege claim is not inextricably intertwined with the previously asserted ground, and thus must be waived.[6]

---

[6] Similar to plaintiffs' indemnification claim, here plaintiffs failed to offer or propose any jury instruction on the issue of absolute immunity, lending further support to the conclusion that it was outside all parties contemplations during the pre-verdict motion. Additionally, during the post-trial

Finally, plaintiffs assert that Dr. Jolin waived his post-verdict claim that there was no evidence to support a finding of a causal link between his statements and any monetary damages. Here again, it is true that Dr. Jolin failed to assert this claim as a ground for dismissal of the defamation claim during the pre-verdict hearing; however, unlike the conceptually distinct claim of absolute privilege, this claim closely relates to the general objection, pre-verdict, that the plaintiffs failed to adduce sufficient evidence to establish their claim of defamation by failing to prove actual defamatory statements. Because Dr. Jolin's post-verdict argument directly addresses the sufficiency of the evidence to prove one of the elements of a defamation claim, it is inextricably intertwined with his initial pre-verdict argument. It is thus acceptable for Dr. Jolin to renew his motion on the insufficiency of evidence by advancing the argument that plaintiffs failed to adduce a connection between his statements and any monetary damage ensuing therefrom.

In this respect, the post-verdict motion is analogous to the post-verdict motion made in Rockport, where the court determined that even where a pre-verdict motion attacked only the sufficiency of evidence proving a breach of contract, for purposes of a negligence claim, proof of appropriate damages was an "essential

---

motions argument, defendants' counsel admitted he merely "came across" the argument as he was "looking things up," and "just threw it [] in," failing to really "follow through on [the argument]."

element." Here, although defendant only attacked the sufficiency of the evidence adduced to prove that defamatory statements were made, proof of a defamation claim requires proof of a causal link between the statements and monetary damages. The arguments are therefore inextricably intertwined and permissibly raised.

II. **The Merits of Defendants' Renewed Motion**

Having dealt with these threshold issues, the court turns now to the substance of the remaining claims contained in defendants' renewed motion.

"A motion for judgment as a matter of law only may be granted when, after examining the evidence of record and drawing all reasonable inferences in favor of the nonmoving party, the record reveals no sufficient evidentiary basis for the verdict." Zimmerman v. Direct Fed. Credit Union, 262 F.3d 70, 75 (1st Cir. 2001). When reviewing a renewed motion for judgment as a matter of law, this Court must "recount the facts in the light most favorable to plaintiffs, drawing all reasonable inferences in their favor." Lama v. Borras, 16 F.3d 473, 475 (1st Cir. 1994). This Court's role is not to "evaluate the credibility of witnesses or the weight of the evidence." Id. Rather, "[i]n the end, the jury's verdict must stand unless the evidence, taken in the light most favorable to the prevailing party, points unerringly to an opposite conclusion." Zimmerman, 262 F.3d at 75.

With respect to defendants' motion for a new trial under Rule 59(a), this court "has a duty to set aside the verdict and grant a new trial if [it] is of the opinion that the verdict is against the clear weight of the evidence, or is based upon evidence which is false, or will result in a clear miscarriage of justice." Coffran v. Hitchcock Clinic, Inc., 683 F.2d 5, 6 (1st Cir. 1982). A new trial is "granted only where the court is convinced that the jury verdict was a 'seriously erroneous result.'" Huber v. JLG Indus., Inc., 344 F. Supp. 2d 769, 772 (D. Mass. 2003) (quoting Coffran v. Hitchcock Clinic, Inc., 683 F.2d 5, 6 (1st Cir. 1982)).

As an alternative to a new trial, the Town and Dr. Jolin seek remittitur. "Under the doctrine of remittitur, a court may condition the need for a new trial on the issue of damages on the prevailing party's acceptance of a reduced sum of damages." Cahill v. TIG Premier Ins. Co., 47 F. Supp. 2d 87, 89 (D. Mass. 1999). The decision of whether to grant remittitur is discretionary. Huber, 344 F. Supp. 2d at 775. "In cases involving economic losses, remittitur or a new trial on the issue of damages is to be granted only when the jury's award exceeds 'any rational appraisal or estimate of the damages that could be based upon the evidence before it.'" Cahill, 47 F. Supp. 2d at 89 (quoting Kolb v. Goldring, Inc., 694 F.2d 869, 871 (1st Cir. 1982)). "A district court should not be too quick to conclude that a jury award was excessive because [t]ranslating legal damage into money damages is

a matter peculiarly within a jury's ken, especially in cases involving intangible, non-economic losses." Huber, 344 F. Supp. 2d at 776 (internal quotation marks and citation omitted).

A. Breach of Contract

Defendants' first non-waived claim for relief is that Dr. Jolin could not have breached the contract as he was not a party to it. Because the contract states that it is between the Johnston School Committee and Chrabaszcz, defendants argue, Dr. Jolin was not personally a party to the contract and therefore cannot be directly liable for any breach that might have occurred. It is, of course, true that Dr. Jolin was not specifically named in the contract; but, as plaintiffs point out, because Dr. Jolin was the Superintendent at the time the contract was signed, he held statutory duties including, but not limited to, "administrative responsibility for the School System, including the administrative personnel function of the School Department consistent with Policies established by the School Committee and to provide for the evaluation of department personnel."

Nevertheless, "an agent is not ordinarily liable for his principal's breach of contract," McCarthy v. Azure, 22 F.3d 351, 360 (1st Cir. 1994), and where "an agent acts on behalf of a disclosed principal, the agent will not be personally liable for a breach of contract, unless there is clear and explicit evidence of the agent's intention to be bound." Mastropieri v. Solmar Constr.

Co., Inc., 159 A.D.2d 698, 699, 553 N.Y.S.2d 187, 188 (1990); see also Restatement (Second) of Agency § 328 (1958) ("An agent, by making a contract only on behalf of a competent disclosed . . . principal whom he has power so to bind, does not thereby become liable for its nonperformance."). Thus, although "an agent may sometimes be liable in negligence to one with whom he deals," Grande v. St. Paul Fire & Marine Ins. Co., 436 F.3d 277, 284 (1st Cir. 2006) (emphasis supplied), it is not the case that Dr. Jolin can be liable for breach of contract where he was not a party to it, even though his actions may be imputed to the School Committee.

Defendants next challenge the jury's finding that the School Committee breached the contract. First, they argue that the evidence cannot support the jury's conclusion that the two contractual provisions at issue were breached. Specifically, defendants contend that Section XIII[7] required Chrabaszcz to submit

---

[7] Section XIII of the contract states:

> The Superintendent shall evaluate the performance of the Administrator annually based on the following standards of evaluation: a) relevant language contained in this contract; b) the policies and directives of the Committee; c) the policies and directives of the Superintendent; d) job description for the position assigned; and f) professional growth. Documented weak performance, an inadequate professional growth plan and/or follow-through, and/or poor fiscal management are some causes for the Superintendent to mandate a plan designed to lead to satisfactory performance. Failure to achieve the goals of such a plan within a reasonable amount of time may lead to consequences such as non-renewal of this Contract or action to terminate the contract prior to its expiration. The only occasion in

individual improvement goals and a professional growth plan as a condition precedent to an evaluation. Because he failed to do this, the obligation of the School Committee to evaluate Chrabaszcz was never triggered because any evaluation must be based, at a minimum, on the five elements described in the provision. Thus, as defendants read the provision, because Chrabaszcz failed to submit individual improvement goals and a professional growth plan, the evaluation could not occur and, consequently, the jury's finding that the provision was breached is impermissible.

This argument can be easily rejected, as it was before. It is clear that as a matter of law the self-evaluation which defendants claim Chrabaszcz was compelled to provide, was not a condition precedent to an annual evaluation. Report & Recommendation of Judge Lincoln D. Almond, at 28; see Ellis v. United States, 313 F.3d 636, 646 (1st Cir. 2002) (explicating the second branch of the law of the case doctrine as commanding that "a court ordinarily ought to respect and follow its own rulings, made earlier in the same case"). A condition precedent is "an act which must occur before performance by the other party is due." Hope Furnace Assocs., Inc. v. FDIC, 71 F.3d 39, 43 (1st Cir. 1995). There is no compelling argument that the plain language of Section XIII

---

which the Superintendent will designate an evaluation of the Administrator would be in a case of an Assistant Principal being review[ed] by the Principal. Generally these evaluations shall be completed between May and August.

presupposes such an initial act. Section XIII lists a number of factors for consideration in an annual evaluation. It does not articulate a requirement that the evaluation cannot occur unless a written professional growth plan or individual improvement goals are submitted. A jury thus could easily find that the provision was breached because of the undisputed failure by the School Committee to evaluate Chrabaszcz. In this regard the jury's finding is not clearly erroneous and does not run counter to the weight of the evidence. Defendants' motion for a new trial on this issue is thus defective.

Defendants next contend that plaintiffs failed to sufficiently prove that the lack of an evaluation proximately caused damages. For support of this contention, defendants point out that had an evaluation been prepared, there was nothing in the record to suggest that it a) would have been in writing and b) would have been favorable. Although a jury could have drawn this inference, "on a motion for judgment notwithstanding the verdict the evidence must be viewed in the light most favorable to the party for whom the jury found, and . . . that party must be given the benefit of every favorable inference that may be fairly drawn." Redgrave v. Boston Symphony Orchestra, Inc., 855 F.2d 888, 896 (1st Cir. 1988) (en banc) (internal quotations and citations omitted). Here, plaintiffs submitted evidence that the internal investigation into Chrabaszcz's behavior revealed no evidence of wrongdoing.

Additionally, plaintiffs adduced a surfeit of evidence that Chrabaszcz was generally considered an "outstanding administrator" even in spite of his suspension. Based on this evidence, a jury could have reasonably inferred that any evaluation would have been favorable. Indeed, the inference is proved in the negative - that is, no jury could have reasonably concluded that an evaluation of Chrabaszcz would have been negative. Certainly the evidence could not support this. Thus, the only inference one could draw is that it would have been positive.

However, "to receive consequential damages, the plaintiff must establish a 'basis for an inference of fact' that the plaintiff has actually been damaged." Id. (quoting Williston, Contracts, § 1345 at 231). Thus, notwithstanding the reasonable inference of a favorable evaluation, defendants argue that "there is no evidence to even suggest . . . that any prospective employer requested [the evaluation] or that it would have made any difference in the plaintiff's attempts to secure another job."[8]

In order for Chrabaszcz to establish that the breach of the contract resulted in the loss of professional opportunities, he must not only have presented evidence that he lost future professional opportunities, but also that "such losses were the

[8] Defendants do not contest that such damages are within the ken of a breach of contract action. See Redgrave, 855 F.2d at 893; Wells v. Uvex Winter Optical, Inc., 635 A.2d 1188, 1191 (R.I. 1994).

result of [the breach] rather than the result of other, independent factors." Id. At 896. Distilled to its core, the question here is whether the evidence presented was sufficient to support a finding that the loss of the East Providence position or the loss of the Smithfield position was caused by the failure of the defendants to give Chrabaszcz an evaluation. As Redgrave notes, the breach of the contract must have done more than "just highlight . . . the potential problems" in hiring Chrabaszcz, the breach must instead actually be a cause of the decision not to hire. 855 F.2d at 894. In other words, the breach of contract will be a proximate cause of the harm if "that harm would not have occurred but for [the failure to give Chrabaszcz an evaluation] and that the harm was a natural and probable consequence of the [breach]." Id. At 893.

Instructive to our analysis, in Redgrave the Court of Appeals for the First Circuit largely rejected a jury's finding of consequential damages through loss of future professional opportunities flowing from the breach of a contract by the Boston Symphony Orchestra ("BSO") because such harm was not sufficiently proved at trial. 855 F.2d at 896-900. There, Redgrave sought to prove that because the BSO breached its contract with her, she lost a number of future professional opportunities.[9] The court

---

[9] There was no dispute that the BSO was motivated to cancel the contract with Redgrave because of her outspoken views on certain hot-button political issues including her stated support for the Palestinian Liberation Organization.

determined that there was insufficient evidence to support most of the claims of lost professional opportunities because, in part, "Redgrave presented nothing other than the fact that three expected offers or productions did not materialize," which was not the "type of circumstantial evidence . . . sufficient to support a finding of consequential damages." Id. at 900.

The court did, however, identify "one piece of evidence from which reasonable factfinders could draw conflicting inferences and upon which a reasonably ascertainable damage award could be granted." Id. at 900. Thomas Mann, a producer of the play Heartbreak House testified that:

> in considering whether to hire Redgrave, he and his partners were concerned about losing support from foundations and subscribers, having difficulty selling tickets, and dealing with possible physical disruptions.

Id. The court noted that because these factors resulted from the community response to Redgrave's political views and were therefore the same factors that motivated the BSO to cancel its contract with Redgrave, "one possibly could infer from Mann's testimony that the BSO cancellation was not a proximate cause of the damage suffered by Redgrave in being denied the part in Heartbreak House." Id. But, Mann also testified that:

> he and his partners were affected by the BSO cancellation because the BSO was a premier arts organization and was dependent on the same type of support as Circle in the Square [Mann's production company].

Id. Thus, according to the court:

> [a] jury reasonably could infer that the BSO's cancellation did more than just highlight for Mann the potential problems that hiring Redgrave would cause but was actually a cause of Mann's decision, perhaps because Mann's theater support was similar to that of the BSO or because Mann felt influenced to follow the example of a "premier arts organization."

Id. It is important to note here that an inference that the BSO's cancellation caused the loss of the opportunity was found to be reasonable based on: 1) Redgrave's testimony that Mann had considered her for the role in Heartbreak House; and 2) Mann's testimony that he and his partners were affected by the BSO's cancellation.

By contrast, in Rice v. Community Health Ass'n, 203 F.3d 283 (4th Cir. 2000), the Court of Appeals for the Fourth Circuit refused to find a proximate causation link where the plaintiff "failed to present any evidence that the Hospital's breach actually influenced any identifiable potential job offers." Id. at 289. In Rice, a doctor (Rice) was suspended for alleged sexual harassment, refusal to treat certain patients, and other violations of the employment agreement. Rice sought to prove, among other things, that the hospital breached the contract by wrongfully suspending and terminating him. A jury agreed, and awarded him over $1.4 million dollars in "future consequential damages" for lost professional opportunities. Id. at 285.

On review, however, the court found first that "Rice did not allege that the Hospital's breach of contract resulted in the loss

of future 'identifiable professional opportunities' that would have been available to him absent the breach." Id. at 289. Notwithstanding this defect, the court also looked at the sufficiency of evidence supporting an award of future consequential damages. Distinguishing Redgrave and holding that no inference of lost professional opportunities was reasonable, the court elaborated:

> [Rice] offered [only] the expert testimony of two doctors who opined generally that an emergency room physician who was fired for sexual harassment or whose previous employer refused to comment on his qualifications would experience substantial difficulty obtaining a full-time position. These experts did not testify that Rice had applied for employment with them or that they had reviewed applications Rice had submitted to other hospitals. Thus, their testimony, unlike that of the producer in Redgrave, 'did [nothing] more than . . . highlight . . . the potential problems' Rice might experience in obtaining comparable employment.

Id. (Quoting Redgrave, 855 F2d at 900).

This case falls in a middle ground of sorts between Regrave and Rice. On one hand, in contradistinction to Rice, Chrabaszcz offered more than just general evidence that the lack of an evaluation, combined with a non-renewal and administrative leave would cause an administrator difficulty in obtaining another position; Chrabaszcz submitted convincing evidence that he was not just considered, but selected as a finalist for two separate positions. On the other hand, there is no testimony, as in Redgrave, by any of Chrabaszcz's potential employers that they were persuaded not to hire him because of the lack of an evaluation (the

ostensible breach). There was testimony, however, that Chrabaszcz likely did not obtain the Smithfield position because "his problems in Johnston followed him."

The question, then, is whether a jury could have made a rational and reasonable inference that, had Chrabaszcz received the evaluation, it would have cured the lingering concerns and rumors concerning the Johnston suspension and secured him the position. This is a close question; however, at bottom, the court is willing to accept the jury's inferences as reasonable and based on more than "speculation and conjecture." Carlson v. Am. Safety Equip. Corp., 528 F.2d 384, 386 (1st Cir. 1976). Although evidence proving merely "the fact that three expected offers or productions did not materialize," is not sufficient circumstantial evidence to support a finding of consequential damages from a breach of contract, Redgrave 855 F.2d at 900, in light of evidence that a potential employer retained some concerns about hiring a candidate because of a previous event, the inference that an evaluation "setting the record straight," as it were, would have resolved those lingering concerns, is not clearly unreasonable. See Hendricks & Assocs., Inc. v. Daewoo Corp., 923 F.2d 209, 214 (1st Cir. 1991) ("The trial court is compelled, therefore, even in a close case, to uphold the verdict unless the facts and inferences, when viewed in the light most favorable to the party for whom the jury held, point so strongly and overwhelmingly in favor of the

movant that a reasonable jury could not have arrived at this conclusion." (internal quotation marks and citation omitted); Peckham v. Cont'l Cas. Ins. Co., 895 F.2d 830, 839 (1st Cir. 1990) (recognizing that the court "cannot reject possibilities [that are] rooted in the record merely because, if sitting as factfinders, we would likely have drawn a different set of conclusions," even where those possibilities were "relatively remote"); see also Correia v. Fitzgerald, 354 F.3d 47, 56 (1st Cir. 2003) (questions of causation "are normally grist for the jury's mill,") (quoting Peckham, 895 F.2d at 837); Fenner v. Gen. Motors Corp., 657 F.2d 647, 650 (5th Cir. 1981) ("{A] jury may properly reconstruct a series of events by drawing an inference upon an inference," so long as the inference relied upon is reasonable.).

It is of course true that a jury could have adopted defendants' position with respect to the absence of an evaluation and concluded that it had no effect on Chrabaszcz's failure to obtain these positions. However, it is also reasonable (even if a bit of stretch), and therefore not susceptible to a motion for judgment notwithstanding the verdict, for the jury to have inferred that the breach of the contract -- the failure to evaluate Chrabaszcz -- contributed proximately to his inability to secure a position. Accordingly, defendants' motions in the alternative on this issue will be denied.

B. Defamation

Defendant Jolin advances three grounds for why there was insufficient evidence for the jury to find that he was liable for defamation. First, he alleges that the statements at issue were not defamatory; second, he argues for a qualified privilege for his statements, negativing the claim for defamation even if, arguendo, the statements were defamatory; and third, he contends that no causal link existed between the alleged defamatory statements and the damages suffered by Chrabaszcz.

Under Rhode Island law, defamation requires proof of: (1) a false and defamatory statement concerning another; (2) an unprivileged publication to a third party; (3) fault amounting at least to negligence on the part of the publisher; and (4) damages unless the statement is actionable irrespective of special harm. Healey v. New England Newspapers, Inc., 555 A.2d 321, 324 (R.I. 1989). In this context, a defamatory statement encompasses any false and malicious words "which tends to degrade [a person] in society or bring him into public hatred and contempt." Elias v. Youngken, 493 A.2d 158, 161 (R.I. 1985) (internal citation omitted). Where the statement is one of fact, it must first be shown to be false; however, if the at-issue statement is an opinion, it may be defamatory "if and only if 'it implies the allegation of undisclosed defamatory facts as the basis for the opinion.'" Cullen v. Auclair, 809 A.2d 1107, 1110 (R.I. 2002)

(quoting Beattie v. Fleet Nat'l Bank, 746 A.2d 717, 721 (R.I. 2000)). Additionally, "[w]hen considering whether a statement or conduct is defamatory, the court must take into account the context of the statement in which the publication occurs and the plain and ordinary meaning of the words in the community in which the publication occurred." Alves v. Hometown Newspapers, Inc., 857 A.2d 743, 750-51 (R.I. 2004) (internal citations and quotations omitted).

At trial, testimony was admitted regarding several statements made by Dr. Jolin about Chrabaszcz. Initially, during a meeting after Dr. Jolin had placed Chrabaszcz on administrative leave, Dr. Jolin stated that "if you try and fight me on this I'll bury you." Subsequently, at a School Committee meeting in June 2000 regarding Chrabaszcz's non-renewal (while the investigation was ongoing), Dr. Jolin stated that, "he didn't want this forum to deteriorate into a discussion of Mr. Chrabaszcz's character or quality." Then, at a second School Committee meeting on October 3, 2000, after the investigation had concluded and revealed no evidence of wrongdoing, Dr. Jolin stated that Chrabaszcz "was a detriment to the student body and a liability to [myself] and the School Committee," and additionally stated that "it became necessary to place Mr. Chrabaszcz on leave with pay pending an investigation into matters that may have been unprofessional." Additionally, plaintiffs submitted evidence that Dr. Jolin spoke with prospective employers

about Chrabaszcz, although the substance of these conversations remains somewhat of a mystery.

Dr. Jolin asserts that his statement that "he didn't want this forum to deteriorate into a discussion of Mr. Chrabaszcz's character or quality" and his statement that Chrabaszcz "was a detriment to the student body and a liability to [myself] and the School Committee" cannot as a matter of law qualify as defamatory because they are neither malicious nor false and "cannot be said to degrade the plaintiff in society or bring him into public hatred and contempt." Instead, he suggests, the "statement[s] merely reflect[] [his] approach to the meeting[s]." This court disagrees. Although it is theoretically possible that the statements could have been plain and innocuous in the abstract, merely reflecting the considered opinion of Dr. Jolin, "[t]he decisive inquiry . . . is what the person [] to whom the communication was published reasonably understood as the meaning intended to be expressed." Swerdlick v. Koch, 721 A.2d 849, 860 (R.I. 1998) (internal quotation marks and citation omitted).

In the context of this case, the statement that Chrabaszcz was a "detriment to the student body," and a "liability" to the School Committee, made during an open School Committee meeting four months after the investigation into wrongdoing had closed and by the same man who earlier had threatened that "if you fight me on this, I'll bury you," could clearly have been considered by the jury as

malicious and having had the effect of degrading Chrabaszcz in his community. Moreover, the statement was made to community members in attendance at the School Committee meeting who were presumably[10] familiar with the events leading up to the suspension.

Thus, in connection with the statement that "it became necessary to place Mr. Chrabaszcz on leave with pay pending an investigation into matters that may have been unprofessional," the statement insinuates that the investigation unearthed, at minimum, unprofessional actions that rendered Chrabaszcz a liability and detriment to the school and to the student body. Because no such behavior was ever discovered, let alone proved, a jury could reasonably have concluded that Dr. Jolin's statement "implie[d] the allegation of undisclosed defamatory facts," and therefore was defamatory.

The same is true for Dr. Jolin's statement that "he didn't want this forum to deteriorate into a discussion of Mr. Chrabaszcz's character or quality." This statement could reasonably be interpreted as implying some defamatory and false underlying fact that would cause the discussion to "deteriorate." The jury quite clearly credited plaintiffs' contentions that no wrongdoing or untoward behavior ever occurred, and that Dr. Jolin's

---

[10] The record evidence obviously provides support for this: in a small community when the high school principal is put on leave, told to stay clear of school property with implications of misconduct toward students, everybody knows.

efforts to suspend and remove Chrabaszcz were motivated by personal ill will. Consequently, the statements cannot be considered, as a matter of law, merely the "rendering [of Dr. Jolin's] opinion," as defendants urge this court to conclude; based on the context, their meaning and effect could reasonably have been determined to be defamatory. The Court will therefore not disturb the jury's finding in this regard. Cf. Mandel v. Boston Phoenix, Inc., 456 F.3d 198, 209 (1st Cir. 2006).

Beyond this, defendants claim that Dr. Jolin possessed a qualified privilege to make the statements, thereby defeating any claim of defamation. Defendants contend that Dr. Jolin had a duty to speak out at the School Committee hearings because it was his responsibility to "speak out and voice his opinion for the good of the school department." Thus, defendants suggest, because the school department had made the decision not to renew Chrabaszcz's contract, it was incumbent upon Dr. Jolin to articulate the reasons for the decision to the public. Because the statements went to explain the decision, they qualify under the privilege. Plaintiffs concede that the forum in which the statements were made could conceivably provide the necessary justification for the statements, but argue that the statements were made in bad faith and therefore cannot qualify for the privilege.

An actor acquires a qualified privilege for the publication of statements "if the publisher makes the statements in good faith and

reasonably believes that he has a legal, moral, or social duty to speak out, or that to speak out is necessary to protect either his own interests, or those of third person[s], or certain interests of the public." Mills v. C.H.I.L.D., Inc., 837 A.2d 714, 720 (R.I. 2003) (quoting Ponticelli v. Mine Safety Appliance, Co., 247 A.2d 303, 305-06 (R.I. 1968)). "To overcome such a qualified privilege, the plaintiff must prove that the person making the defamatory statements acted with ill will or malice." Id.; see also DiBiasio v. Brown & Sharpe Mfg. Co., 525 A.2d 489, 492 (R.I. 1987) (holding that in order to prove that a publisher "exceeded the privilege," a plaintiff "must show that the primary motivating force for the communication was the publisher's ill will or spite toward him.").

Here, the jury was instructed on the doctrine of qualified privilege and concluded that Dr. Jolin's statements were not entitled to it.[11] This Court will not override this determination because, taking the evidence in a light most favorable to the plaintiffs and construing all inferences in the plaintiffs' favor, the jury could reasonably have concluded that Dr. Jolin's statements were made in bad faith and were therefore not protected by the privilege. As discussed above, uncontroverted evidence was presented that Dr. Jolin, before the School Committee meetings

[11] At the post-trial motions hearing, there was some discussion as to which statements the jury found to be defamatory. However, defendants have not presented any developed argument in connection with this colloquy, and, in any event, failed to object to the general instruction given to the jury concerning defamation.

occurred, told Chrabaszcz that "if you fight me on this, I'll bury you." Viewed in this light, a jury could reasonably have concluded that "the primary motivating force" for the post-investigation statement that Chrabaszcz was "a detriment to the student body and a liability to [myself] and the School Committee," was Dr. Jolin's ill will or spite. Mills, 837 A.2d at 720.

It is not the case, as Dr. Jolin argues, that such a finding would transform any statement recommending the non-renewal of any administrator into a defamatory one because, here, there was ample contextual evidence suggesting that the statements were made maliciously or in furtherance of an intentional scheme to discredit or degrade Chrabaszcz, as opposed to in good faith. It is of course true that the statements could have been innocent, in good faith, and made in a legitimate attempt to explain the non-renewal decision; however this was not the only conceivable conclusion, and the jury's finding to the contrary was neither based on insufficient evidence compelling judgment as a matter of law nor against the clear weight of the evidence compelling a new trial.

Finally, Jolin claims that the evidence at trial was insufficient to support a finding of damages flowing his defamatory statements. Here, both parties agree that proof of damages was a necessary element to the defamation claim because the defamatory statements at issue were not actionable per se. See Swerdlick, 721 A.2d at 861 ("[F]or statements to qualify as libel per se, the

publication must impute insolvency, financial embarrassment, unworthiness of credit, or failure in business of a plaintiff.") (internal quotations omitted). Normally, proof of harm may include "general injury to reputation, consequent mental suffering, alienation of associates, specific items of pecuniary loss, or whatever form of harm would be recognized by state tort law." Intercity Maint. Co. v. Local 254, 241 F.3d 82, 89 (1st Cir. 2001).[12] Under Rhode Island tort law, an award of damages in a

---

[12] As this formulation suggests, a plaintiff need not first prove reputational harm before he may prove mental or physical harm as a result of defamatory statements. Or, to state it somewhat differently, Intercity does not hold that absent proof of reputational harm (but where there is proof of other injury) a claim for damages from defamation will be defeated. It is of course true that a plaintiff may not rest on the common law presumption of damages, "in which the existence of injury is presumed from the fact of publication without evidence of actual loss," where the statements are not libelous per se. Intercity, 241 F.3d at 89. But evidence of actual loss is not limited to, or premised on, proof of reputational harm, rather, as Rhode Island law makes clear, defamation damages may consist of mental anguish, humiliation, and other physical injury. Bosler v. Sugarman, 440 A.2d 129, 132 (R.I. 1982) ("The award of compensatory damages . . . may be based upon the mental anguish and humiliation experienced as a result of the defamatory statements."); Restatement (Second) Torts, § 621 cmt. b (1977) ("The Constitution does not require proof of impairment of reputation before damages for emotional distress can be recovered."); see Gertz v. Robert Welch, Inc., 418 U.S. 323, 350 (1974) (declining to define actual injury in defamation claims, instead noting that "customary types of actual harm inflicted by defamatory falsehood include impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering."); Fiori v. Truck Drivers, Local 170, 354 F.3d 84, 87 (1st Cir. 2004) (holding that because under Massachusetts law, defamation damages include "harm to reputation and mental suffering," evidence that plaintiff felt humiliated and embarrassed and had difficulty sleeping as a result of the statements was proof of "mental distress [was] sufficient to allow the libel claim to go to the jury.")

defamation claim "may be based upon mental anguish and humiliation experienced as a result of the defamatory statements. Bosler, 440 A.2d at 132; see Healey, 555 A.2d at 326-27. Therefore, although a plaintiff cannot "rest on an unsubstantiated allegation of injury to [his] reputation," in order to succeed on his defamation claim, Intercity, 241 F.3d at 90, where evidence demonstrates mental anguish, suffering, or humiliation "as a reaction to the statements made by defendant," it will be sufficient to allow the defamation claim to go to a jury. Bosler, 440 A.2d at 133.

Here, Chrabaszcz testified persuasively that he suffered significant mental anguish and humiliation stemming, in part, from the public statements made by Dr. Jolin. Based on these statements, Chrabaszcz sought continued counseling and medical help.[13] He also testified that after the statements were made, he would periodically find printed copies of them placed under his door. He testified that this caused him injury and also was partially responsible for his resignation from the Winthrop High School principal position. He also testified that feared going out to public, school-associated events because of embarrassment.

This evidence is probative of how Chrabaszcz suffered injury as a reaction to the statements made by Dr. Jolin and included not

---

[13] Chrabaszcz testified that he initially sought counseling in July of 2000, before the October 2000 statements but after the June 2000 statement. Nevertheless, he stated that he continued the counseling for approximately two years because the symptoms failed to abate.

only mental anguish and humiliation, but also injury to Chrabaszcz's physical health and, ultimately, his position at Winthrop High School. Consequently, the jury was presented with evidence from which it could determine an amount of damages flowing from the defamatory statements. Cf. Fiori, 354 F.3d at 89 (declining to impose a higher level of certainty for compensatory damages beyond a deferential review of the jury's assessment of actual damages so long as there is "no concern[] . . . with an amount of damages that is provocatively imaginative and might be a cloaked award of punitive damages.").

In this case, the jury was instructed, without objection, on the issue of damages proximately caused by any defamation that might have occurred. Its finding that the defamatory statements caused injury is rational and will not be disturbed where, as here, there was adequate evidence to support such a finding. The court thus rejects defendants' request for a new trial or remittitur. Consolo v. George, 58 F.3d 791, 795 (1st Cir. 1995) ("As the verdict was entirely consistent with the evidence, the assessment of damages cannot be disturbed unless the award exceeded 'any rational appraisal or estimate of the damages that could be based upon the evidence[.]'"); cf. Mandel, 456 F.3d at 210.[14]

[14] Because, as both parties agree, loss of consortium claims are derivative in nature, see Sama v. Cardi Corp., 569 A.2d 432, 433 (R.I. 1990), judgment as a matter of law may only enter on these claims if the defamation claims are dismissed. Because, here, the defamation claim is not dismissed, the loss of consortium

To the extent that defendants take the position that the failure to submit or support a specific dollar amount for damage to reputational harm renders the jury's verdict deficient, this challenge can be summarily rejected. It is beyond dispute that although evidence of actual harm need be more than a "scintilla," Intercity, 241 F.3d at 90, it has never been the case that the evidence must advert to an actual dollar amount for the injury. See Gertz, 418 U.S. at 349-50. Indeed, beyond bare assertion, defendants point to no case supporting this position.

C. Impermissible Admission of Testimony and Evidence

Lastly, defendants desire a new trial on all counts because of their fear that certain evidence and testimony relating to Chrabaszcz's placement on administrative leave prejudiced them such that they did not receive a fair trial. This claim may be easily dismissed. It is well-settled that district courts "ha[ve] wide discretion in steadying the Rule 403 seesaw." Onujiogu v. United States, 817 F.2d 3, 6 (1st Cir. 1987). Here, the admission of evidence that Chrabaszcz was placed on administrative leave was relevant for the purpose of determining the motivation behind Dr. Jolin's public statements. Additionally, this evidence, and the testimony connected with it, was relevant because it tended to place the absence of an evaluation in context, and could have explained why Chrabaszcz may not have disclosed his problems in

---

claims likewise remain intact.

Johnston. Consequently, the jury could have utilized this evidence for those purposes, and its admission did not have an unduly prejudicial effect. United States v. Tierney, 760 F.2d 382, 388 (1st Cir. 1985).

More importantly, however, this evidence was admitted in large part for support of plaintiffs' liberty interest claim, which this court dismissed before the case went to the jury. It was, therefore, incumbent upon the defendants to seek a limiting instruction at the time the jury was charged if they in fact believed that the jury might be impermissibly prejudiced in some way. Because they failed to make a timely objection, pursuant to Fed. R. Civ. P. 51, they have not preserved the error. The court may therefore only consider the alleged error if it is plain and affects the substantial rights of the defendant. Fed. R. Civ. P. 51(d)(2). Here, nothing in the admission of evidence and testimony surrounding the issue of administrative leave rises to such a level, even were it admitted in error. Defendants' motion for a new trial on this ground is denied.

## III. Plaintiffs' Motion for Modification/Clarification of Judgment and the Parties' Cross Motions for Attorney's Fees

Moving to plaintiffs' motion for modification/clarification of the judgment, they urge this court, pursuant to Federal Rule 60(a), to modify the Judgment to "include the Jury's finding that Defendants are '100%' liable for attorney's fees." As it stands

now, judgment entered only on the precise monetary amounts found by the jury. On the verdict form, however, the jury concluded that defendants had breached the employment agreement, and to the question, "If you find in favor of Plaintiff, in what amount?" the jury answered, "$116,518 Plus 100% Atty fees." Consequently, plaintiffs seek to amend the judgment to include the jury's finding that defendants are liable for all of plaintiffs' attorney's fees. The plaintiffs' motion must be denied.

Modification or clarification of the judgment is only appropriate where the error is clerical or ministerial in nature, Fed. R. Civ. P. 60(a),[15] and "enables a court to ensure that its orders, judgments, and other parts of its record of proceedings are an accurate reflection of the true actions and intent of the court and the parties." 12 James Wm. Moore, Moore's Federal Practice § 60.02[1] (3d ed.). Although it is "not a vehicle . . . to change what has been deliberately done," 11 Federal Practice and Procedure

---

[15] The rule provides:

> (a) **Clerical Mistakes**. Clerical mistakes in judgments, orders or other parts of the record and errors therein arising from oversight or omission may be corrected by the court at any time of its own initiative or on the motion of any party and after such notice, if any, as the court orders. During the pendency of an appeal, such mistakes may be so corrected before the appeal is docketed in the appellate court, and thereafter while the appeal is pending may be so corrected with leave of the appellate court.

Fed. R. Civ. P. 60(a).

§ 2854 at 249, it likewise cannot be used to ratify or import an "error of substantive judgment." Pfizer, Inc. v. Uprichard, 422 F.3d 124, 130 (3d Cir. 2005). Here, because the jury's award of attorney's fees is impermissible under any theory of recovery, its absence in the judgment cannot be corrected under Rule 60(a).

Anticipating this hurdle, plaintiffs argue that the jury's award of "100% Attorney's Fees" as damages for defendants' breach of the employment agreement signals its conclusion that defendants breached the indemnification clause of the agreement, thereby entitling plaintiffs to all attorney's fees associated with such breach. This argument is a non-starter.[16] The indemnification clause in this case addresses a narrow class of matters for which an administrator, like Chrabaszcz, may be entitled to indemnification, and none of those matters were implicated here.[17] The clause limits indemnification to costs incurred only from actions arising out of "any act or omission of the Administrator

---

[16] The court did not address this argument previously because defendants waived their right to bring a claim concerning the relevance of the indemnification clause.

[17] In full, the indemnification clause states:

> The School Committee will fully indemnify and/or defend the Administrator for any and all personal financial loss or expenses, including legal fees and costs, arising out of any claim, action, award, compromise, settlement or judgment attributable to any act or omission of the Administrator while acting in good faith within the scope of his/her duties or employment, Such indemnification may be provided by insurance or otherwise.

while acting in good faith within the scope of his/her duties or employment." The clause thus does not contemplate reimbursement for costs associated with an administrator's suit against the School Committee for breach of contract or defamation, because it does not involve an "act or omission" of Chrabaszcz (the Administrator) and does not fall within the scope of Chrabaszcz's employment or duties.

This case is, therefore, not coterminous with McGuire v. Russell Miller, Inc., 1 F.3d 1306 (2d Cir. 1993), where the parties explicitly contracted to permit recovery of attorney's fees in the event of a breach of a contract. In McGuire, the parties entered into a contract providing for indemnification of "[a]ll costs, assessments, judgments and demands (including costs of defense, settlement, compromise, and reasonable attorney's fees) arising out of any claim, or the defense, settlement or compromise thereof," in connection with, inter alia, "[t]he breach by McGuire of any warranty or representation made by McGuire pursuant to or in connection with this Agreement[.]" 1 F.3d at 1309. Costs associated with the breach of the Agreement itself were obviously contemplated in the indemnification clause, and the Court of Appeals for the Second Circuit thus allowed such a damages award in

the form of attorney's fees to flow from the breach of the agreement.[18]

Here, the parties simply did not contract for the indemnification of attorney's fees for any action relating to Chrabaszcz's employment dispute. Consequently, the jury was without authority to award attorney's fees for its finding that the School Committee breached the employment agreement.

Plaintiffs also argue that, pursuant to Rule 60(a), the court should correct the absence of an award of prejudgment interest in the judgment. They suggest that the court modify the judgment to assess interest from August 31, 2000, the date, plaintiffs claim, that the breach of contract cause of action accrued. Although defendants agree that such a modification is allowable under Rule 60(a), they contend that the appropriate start date for an award of prejudgment interest is the date of filing of the law suit. Of course, despite both parties' confidence that this court may properly award prejudgment interest pursuant to Rule 60(a), that conclusion is not foreordained. In fact, contrary to the parties' assertions, the Court of Appeals for the First Circuit has squarely held that "Rule 59(e) [rather than Rule 60(a)] is the proper

[18] Plaintiffs point to McGuire because there the jury awarded "attorney's fees" in its verdict for a breach of the contract. Despite the fact that no evidence was submitted on the amount of attorney's fees, the Second Circuit determined that this finding entitled defendants to a monetary award, to be found by the judge. Presumably, plaintiffs see the jury's finding in this case as analogous, entitling them to a monetary award.

procedural vehicle for motions seeking to revise a judgment to include an initial award of prejudgment interest." Crowe v. Bolduc, 365 F.3d 86, 92 (1st Cir. 2004).[19]

Nevertheless, a number of facts specific to this case suggest that the appropriate course of action would be to construe plaintiffs' Rule 60(a) motion for prejudgment interest as, in substance, a motion to amend or alter the judgment pursuant to Rule 59(e). First, because the jury returned a verdict that included the phrase "100% attorney's fees," which was not transcribed to the judgment, plaintiffs were compelled to bring a Rule 60(a) motion in an attempt to seek what they viewed as a clerical error in the judgment, thus explaining the use of a Rule 60(a) motion as the vehicle here. Second, both parties, and the court, agree that prejudgment interest in some amount is statutorily warranted in this case. Third, and most importantly, plaintiffs filed their Rule 60(a) motion within 10 days after entry of the judgment.

As the First Circuit explained in Crowe, requiring a "resort to Rule 59(e)" for postjudgment claims of prejudgment interest is justified as a policy matter because it "further[s] the important goal of avoiding piecemeal appellate review of judgments," 365 F.3d at 92 (quoting Osterneck v. Ernst & Whitney, 489 U.S. 169, 177 (1989)), in large part because Federal Rule of Appellate Procedure

---

[19] Rule 59(e) states: "Any motion to alter or amend a judgment shall be filed no later than 10 days after entry of the judgment." Fed. R. Civ. P. 59(e).

4(a) "renders ineffective any notice of appeal filed while a Rule 59(e) motion is pending." Osterneck, 489 U.S. at 177. Thus, "[b]y preventing appellate review before a postjudgment motion for prejudgment interest is resolved . . . an appellate court will have the benefit of the district court's plenary findings with regard to factual and legal issues subsumed in the decision to grant . . . prejudgment interest." Id. This concern is implicated where, as in Crowe, a party utilizes a Rule 60(a) motion (which imposes a more fluid and discretionary time period) to circumvent the strict 10 day filing period for Rule 59(e) motions. See Crowe, 365 F.3d at 90-91 (noting that Crowe filed a Rule 60(a) motion for prejudgment interest "more than eight months" after entry of judgment).

But here, the policy concerns undergirding the rule are absent. The motion, styled as a Rule 60(a) motion, was timely filed within ten days after the entry of judgment; it is therefore in all relevant respects consistent with the substance of a Rule 59(e) motion. Because all parties agree that the substantive claim is proper, and because this court believes that to require technical precision in this case would needlessly and unwisely elevate form over function, it will construe the motion for prejudgment interest as a Rule 59(e) motion to amend or alter the judgment. See Morgan Guar. Trust Co. of N.Y. v. Third Nat'l Bank of Hampden County, 545 F.2d 758, 760 (1st Cir. 1976) ("Since the

motion to amend could not be maintained under Rule 60(a), we may ask whether it could be maintained under some other provision of the federal rules. We would not hold Morgan to the label of its motion if relief were otherwise obtainable.").

Moving to the substance of plaintiffs' claim to augment the judgment to include prejudgment interest, this court's holding in Buckley v. Brown Plastics Mach., LLC, 368 F. Supp. 2d 167, 170 (D.R.I. 2005) is controlling. Here, the jury awarded $116,518 to the plaintiff for damages flowing from the breach of contract. As in Buckley, this finding set forth only that Chrabaszcz was, at the time of suit, due such an amount. Consequently, because "[i]t is not possible for this Court to accurately determine, based on the jury's verdict, the precise moment Plaintiff was originally entitled to these funds," id. at 172, the Court will apply the "time of filing" approach for the calculation of prejudgment interest. Prejudgment interest, at a rate of twelve percent per annum, will be added to the judgment in the amount of $43,673.40.[20]

A few remaining issues can be dealt with summarily. Although plaintiffs seek prejudgment interest with respect to the jury's damage award for defamation, the fact that a municipality cannot be held liable for prejudgment interest under the State Tort Claims

---

[20] The calculation is as follows: $116,518 (judgment) x .12 (12% per annum) = $13982.16. ($13982.16 / 365 (days in the year)) x 1140 (number of days from April 9, 2003 (the date of filing) to May 22, 2006 (the date of entry of the judgment)) = $43,673.40.

Act, Andrade v. State, 448 A.2d 1293 (R.I. 1982), and the fact that Dr. Jolin unequivocally made the defamatory statements in his official capacity as Superintendent, bar plaintiffs' claim. See Feeney v. Napolitano, 825 A.2d 1 (R.I. 2003).[21]

Last in this post-trial saga, both parties cross-move for attorney's fees, notwithstanding the previous discussion concerning the Rule 60(a) motion. Both motions will be denied. In addition to incorporating the argument made in their Rule 60(a) motion, plaintiffs also contend that they are entitled to attorney's fees under R.I. Gen. Laws § 9-1-45. This provision provides for an award of attorney's fees in breach of contract action where, inter alia, "there was a complete absence of justiciable issue of either law or fact raised by the losing party." § 9-1-45. Plaintiffs' assertions that because a jury found in their favor, and against defendants, on the breach of contract, they are entitled to attorney's fees is meritless for the simple fact that because the issue was allowed to go to a jury, it was inherently "justiciable."

[21] It is of little consequence that defendants did not raise the issue of lack of individual capacity where, as here, the statements at issue were unquestionably made by Dr. Jolin in his official capacity. Cf. Andrade v. Perry, 863 A.2d 1272, 1278 (R.I. 2004) (The defendant in Feeney was not required to contest his capacity to be sued individually primarily because the plaintiff's complaint made it clear that she intended "to sue the defendant only in his official capacity."). Additionally, the complaint did not make clear that the specific statements at issue in this case, namely those made during the School Committee meetings, were those alleged to have been defamatory.

Consequently, plaintiffs' motion for attorney's fees must be denied.

Defendants, not to be outdone, also lobby for attorney's fees based on their belief that a number of the claims made against them were unfounded and that, therefore, they are entitled to a proportionate share of the attorney's fees required to defend the case. The court declines defendants' invitation to find that the plaintiffs' actions were "frivolous, unreasonable, or without foundation," Hughes v. Rowe, 449 U.S. 5, 14 (1980) (quoting Christiansburg Garment Co. v. EEOC, 434 U.S. 412, 421 (1978)). Plaintiffs' case was not "meritless in the sense that it is groundless or without foundation," and the fact that a number of claims did not make it the jury is "not in itself a sufficient justification for the assessment of fees." Id. Accordingly, defendants' motion for attorney's fees is likewise denied.

## IV. Conclusion

Based upon the foregoing, Defendants' Renewed Motion for Judgment as a Matter of Law, Motion for a New Trial, or in the alternative for a Remittitur is hereby DENIED except with respect to Dr. Jolin's motion on the breach of contract verdict which is GRANTED. Plaintiffs' Motion for Modification/Clarification of the Judgement is hereby DENIED in part and GRANTED in part. The parties' cross motions for attorney's fees are, respectively, DENIED. A modified

Judgment consistent with this court's ruling should enter as follows: Addition of prejudgment interest: $43,673.40.

ENTER:

WILLIAM E. SMITH
United States District Judge

DATE: 2/13/07